IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

ANTHONY BARTLESON,

Defendant.

No. CR 14-3022-MWB

MEMORANDUM OPINION AND
ORDER REGARDING ABUSE-OF-
TRUST ENHANCEMENT

_____

**TABLE OF CONTENTS**

I.  **INTRODUCTION**..............................................................................2

II.  **FACTUAL BACKGROUND** ........................................................... 11
    A.  *Undisputed Facts* ................................................................ 11
    B.  *Disputed Facts*.................................................................... 13
    C.  *Admissibility of the Department of Labor Report* ........................... 17
        1.  *Standard for Admissibility of Evidence at Sentencing* ............ 18
        2.  *Case Law on "Sufficient Indicia of Reliability"*.................... 19
        3.  *DOL Report has "Sufficient Indicia of Reliability"* ............... 23

III.  **DISCUSSION**................................................................................ 26
    A.  *Standard for Abuse-of-Trust Enhancement* ................................ 26
    B.  *Parties' Arguments as to Abuse-of-Trust Enhancement* .................. 28
    C.  *Analysis Regarding Abuse-of-Trust Enhancement*.......................... 31
        1.  *Bartleson Occupied a Position of Private Trust* .................... 31
        2.  *Bartleson's Position Facilitated the Commission and Concealment of the Embezzlement*.................................. 38
        3.  *Enhancement Would Not Cause Double Counting* ................ 43
        4.  *Application of Note 5 of the Sentencing Guidelines under U.S.S.G. § 3B1.3* .............................................. 48
            a.  *First Clause of Note 5*......................................... 50
            b.  *Second Clause of Note 5*...................................... 55
    D.  *Restitution*........................................................................ 62

1

   1.  *Restitution Should Include Lost Investment Earnings*
      *and Tax Liabilities* ...................................................... 64
   2.  *Payment Schedule for Restitution* .................................... 71

IV. **CONCLUSION** ........................................................... 74

V. **APPENDIX** ................................................................ 77

## I.  INTRODUCTION

  In this criminal sentencing of a corporate vice president, who embezzled money from thirteen employees' retirement accounts, one of the fighting issues is whether he abused a position of trust. An insightful philosophical work entitled *Trust and Antitrust* focuses on the risks of bestowing trust upon another.[1] The author, Annette Baier, is a moral philosopher and an eminent scholar on the phenomenon of "trust."[2] According to

---

[1] *See* Annette C. Baier, *Trust and Antitrust*, 96 ETHICS 231 (1986). Baier's article will be cited as *Trust* in this opinion for all subsequent citations.

[2] *See* Ethan J. Leib, *Friends as Fiduciaries*, 86 WASH. U. L. REV. 665, 689 n.103 (2009) ("Without a real peer in her league, the best philosopher of trust is Annette Baier."); *see also* Joel F. Handler, *Dependent People, The State, and The Modern/PostModern Search for the Dialogic Community*, 35 UCLA L. Rev. 999, 1076 (August 1988) ("Annette Baier's recent article, *Trust and Antitrust*, is the most systematic treatment of trust in philosophical literature of which I am aware."). Professor Handler's well-written article provides a more thorough analysis and summary of Baier's entire work. Handler's article and assertion that Baier's understanding of "[t]rust involves discretion" in part motivated me to incorporate Baier's work into this opinion. *See* Handler, *Dialogic Community*, 35 UCLA L. Rev. at 1077. More motivation came from the fact that the case law I perused did not cite Baier's brilliant contribution to the philosophical literature on trust. In fact, when I expand the jurisdiction on WestlawNext to include "All State & Federal," not one case arises when I search: "Annette /2 Baier." Baier is not overlooked by secondary sources, however; 191 secondary sources result. If I expand the search to include more words between "Annette" and "Baier," my search results remain the same. If I limit the search to "Annette /1 Baier" my search results consist of 40 less secondary sources and

Baier, "Trust . . . is accepted vulnerability." *Trust* at 235. Baier's conception of trust is informative and contributes to my discussion on the abuse-of-trust enhancement under United States Sentencing Guideline (U.S.S.G.) § 3B1.3. The abuse-of-trust enhancement is the primary focus of this memorandum opinion and order.[3]

Baier's oft-cited article begins with the assertion that the "great moral philosophers," *i.e.*, Plato and Aristotle, have not written much on the issue of trust. *Id.* at 232–33. "[W]hat we find can scarcely be said to be even a sketch of a moral theory of trust." *Id.* at 232. Other "great philosophers," *i.e.*, Saint Thomas Aquinas, John Locke, and Thomas Hobbes, "*have* given explicit attention" to "some forms of trust," *e.g.*, trust in God, governments and officials, and contracts and contractors, respectively. *Id.* at 233. Baier continues: "It is selective attention then, rather than total inattention,

---

still no case law. I was also unable to find any secondary sources that refer to the similarities between Baier's philosophy and the abuse of trust enhancement. I trust (pardon the pun) that this opinion helps fill the void in the scholarship and case law.

[3] In *United States v. Miell*, I reviewed the Commentary to U.S.S.G. § 3B1.3, cmt. (n.1), and relevant precedent of the Eighth Circuit Court of Appeals on the abuse-of-trust enhancement. 744 F.Supp.2d 904, 943–44 (N.D. Iowa 2010). In *Miell*, I held that "the upward adjustment for abuse of a position of trust" applied where the defendant "used his position as landlord to both facilitate and conceal" his offense of fraudulently keeping damage deposits from his renters. *Id.* at 944–45. As later noted by the Eighth Circuit Court of Appeals, at the time of my ruling, no other court had decided "whether a landlord is in a position of private trust to tenants concerning damage deposits under U.S.S.G. § 3B1.3." *See United States v. Miell*, 661 F.3d 995, 998 (8th Cir. 2011) (affirming district court's decision that defendant occupied a position of trust vis-à-vis his tenants regarding their damage deposits). This case presents an opportunity to further elaborate on the abuse-of-trust enhancement, and explain why a former co-owner, Vice President, Secretary, and Treasurer of a company was in a position of private trust to employees concerning the funds he withheld from employees' retirement accounts.

which is the philosophical phenomenon on which I wish to remark, tentatively to explain, and try to terminate or at least to interrupt." *Id.*

Advancing the philosophical dialogue on trust, Baier asserts that trust is a particular kind of reliance: "Trust . . . is reliance on another's good will." *Id.* at 234.[4] Baier's theory of trust involves reliance on the good will of a trustee, and therefore, the truster takes certain risks when relying on the trustee's good will:

> Where one depends on another's good will, *one is necessarily vulnerable to the limits of that good will.* One leaves others an opportunity to harm one when one trusts, and also shows one's confidence that they will not take it. Reasonable trust will require good grounds for such confidence in another's good will, or at least the absence of good grounds for expecting their ill will or indifference. *Trust, then, on this first approximation, is accepted vulnerability to another's possible but not expected ill will (or lack of good will) toward one.*

*Id.* at 235 (emphasis added). Stated another way, when we trust others we accept that we are vulnerable to harm by others. Yet, we believe—and are confident—those we trust will not harm us, even though there is the "opportunity to harm." *Id.* To paraphrase Baier, the question then becomes: why do we put ourselves (or "the things we most

_____

[4] Baier also differentiates "trust," which relies on good will, from mere reliance on a person's dependable "habits" or "psychology," which does not rely on good will. She notes that trust can be betrayed whereas reliance can only be disappointed: "We all depend on one anothers' psychology in countless ways, but this is not yet to trust them. The trusting can be betrayed, or at least let down, and not just disappointed." *Trust* at 234–35; *see also* Handler, *Dialogic Community*, 35 UCLA L. Rev. at 1077 ("Baier draws a distinction between merely relying on the dependable habits of others and trusting; the latter relies on *good will.* This means that when one relies on another's good will, however, one becomes vulnerable to the limits of that good will.").

value") in vulnerable positions for others to harm?  *Id.* at 236.  Her answer is simply that "we need [others'] help in creating, and then in not merely guarding but looking after the things we most value."  *Id.*  "[S]o," in Baier's words, "we have no choice but to allow others to be in a position to harm [the things we most value]."  *Id.*

For Baier, trust implicates varying degrees of discretion.[5]  "When we are trusted," writes Baier, "we are relied upon to realize *what* it is for whose care we have some discretionary responsibility, and normal people can pick up the cues that indicate the limits of what is entrusted."[6]  *Id.* 236.  For example, a babysitter, who is hired to care for a child while the child's parents are temporarily away from their home, goes outside his "discretionary responsibility" and acts in "an untrustworthy way" by painting the child's nursery purple because, in his mind, the change would be an improvement.  *Id.*

The more discretion the truster gives to a trustee, the more vulnerable the truster becomes.  This is because, as Baier explains, by entrusting "discretionary powers" to a trustee, a truster "risks abuse of [the discretionary powers] and the successful disguise of

---

[5] As noted above, the impetus behind my decision to consider Baier's work in this opinion was in part derived from Professor Handler's article and assertion that "[t]rust involves discretion" under Baier's theory of trust.  *See* Handler, *Dialogic Community*, 35 UCLA L. Rev. at 1077.  While I clearly agree with Professor Handler's assertion, I seek to underscore Baier's assertion here that there are varying degrees of discretion implicated by the act of trusting.  This is significant because such variances are explicitly recognized when applying U.S.S.G. § 3B1.3, which I discuss below.  *See* U.S.S.G. § 3B1.3.

[6] Elsewhere in *Trust and Antitrust*, Baier writes, "Trust, on the analysis I have proposed, is letting other persons (natural or artificial, such as firms, nations, etc.) take care of something the truster cares about, where such 'caring for' involves *some exercise of discretionary powers*."  *Trust* at 240 (emphasis added).

such abuse."[7]  *Id.* at 239.  Baier offers helpful examples in her article to clarify this assertion: we trust surgeons and plumbers to use their discretion "to put right what is wrong."[8]  *Id.*  However, surgeons and plumbers may abuse their discretion by performing acts "incompetently, negligently, or deliberately against our interests," and "they may conceal" these bad acts "by pretense" that the abuse took place because of "an honest and well-meaning exercise of the discretion given to them."  *Id.* at 239–40.  As a consequence, the surgeon or plumber "may retain our trust" while having the "opportunity to harm us yet further."  *Id.* at 240.

Not surprisingly, discretion plays a prominent role in the case law applying the abuse-of-trust enhancement under U.S.S.G. § 3B1.3.  Whether the abuse-of-trust enhancement applies at sentencing for a defendant "turns on the nature of the defendant's position and amount of discretion and control relative to the victim, not whether the victim subjectively trusted the defendant."  *See Miell*, 661 F.3d at 999.  "The abuse of trust enhancement *applies only where the offender has abused discretionary authority entrusted to the defendant by the victim.*"  *United States v. Erhart*, 415 F.3d 965, 972 (8th Cir. 2005) (emphasis added).

The Commentary of the Sentencing Guidelines clarifies the distinction between persons in positions of private trust and those that are not: "Persons holding such

---

[7] Baier forecasts this point on the preceding page of her article: "The more extensive the discretionary powers of the trusted, the less clear-cut will be the answer to the question of when trust is disappointed."  *Trust* at 238.

[8] As another example, Baier explains what we trust from our "mailmen": "To use their discretion in getting our mail, (compatibly with their total responsibility) to make intelligent decisions about what to do with it when such decisions have to be made."  *Trust* at 239.

positions [of private trust] ordinarily are *subject to significantly less supervision* than employees whose responsibilities are primarily non-discretionary in nature." U.S.S.G. § 3B1.3 cmt. (n.1) (emphasis added). While the word "supervision" is nowhere to be found in Baier's article,[9] and the concept of supervision is only implicit in her analysis of trust,[10] the degree of one's supervision is essential to determining the applicability of the abuse-of-trust enhancement.[11] *See* U.S.S.G. § 3B1.3. The law seems to account for

---

[9] The noun "supervisor" and the verb "supervise" are also not found in Baier's article.

[10] Baier explains that, following Locke, she analyzes "trusting on the model of *en*trusting." *Trust* at 236. In doing so, Baier "distinguish[es] different forms of trust by the different valued goods we confidentially allow another to have some *control* over." *Id.* (emphasis added). In applying this model of analysis, Baier takes "trust to be a three-place predicate": "A trusts B with valued thing C." *Id.* Implicitly, trustees are subjected to different types of supervision over their control of valued goods or things.

[11] In order not to overstate the significance of "supervision" to a "position of trust," I refer the reader to *United States v. Tann*, 532 F.3d 868, 875–76 (D.C. Cir. 2008). In *Tann*, the United States Court of Appeals for the District of Columbia Circuit remanded the district court's decision to apply the abuse-of-trust enhancement. As the appellate court explained,

> [T]o apply the enhancement to a defendant
>
> > merely because he or she is entrusted with valuable things and has little or no supervision while performing his or her duties[ ] would stretch the abuse-of-trust enhancement to cover endless numbers of jobs involving absolutely no professional or managerial discretion, in clear contravention of the plain language of the commentary to section 3B1.3.
>
> *United States v. West*, 56 F.3d 216, 221 (D.C.Cir.1995).

*Tann*, 532 F.3d at 875–76. In remanding the district court's decision, the appellate court reasoned that *Tann* was distinct from *Becraft*, a case where the appellate court affirmed

the inverse relationship between "supervision" and "discretion." By enhancing a defendant's sentence when a defendant is afforded greater trust—that is, more discretionary authority and less supervision—and he abuses that trust, the law recognizes the increased vulnerability of the victim,[12] which is highlighted in Baier's work, and the defendant's increased culpability.[13]

---

the district court's application of the abuse-of-trust enhancement. *Id.* at 878. This is because the district court in *Becraft* found the defendant "'occupied a trusted supervisory position . . . entailing substantial spending and reporting authority' and her supervisor 'permitted [her] to determine which purchases should be made and accepted her decision without question.'" *Id.* (quoting *United States v. Becraft*, 117 F.3d 1452–53 (8th Cir. 1997)). The appellate court continued: "In other words, the defendant exercised managerial discretion-she decided what to buy for the organization-and was able to perpetrate her fraud because her supervisor deferred to her judgment." *Id.*

[12] A trust relationship arises when "a person . . . intentionally makes himself . . . *vulnerable* to someone in a particular position, ceding to the other's presumed better judgment some control over their affairs." *United States v. Brogan*, 238 F.3d 780, 783 (6th Cir. 2001) (emphasis added).

[13] The United States Sentencing Commission includes a description of the "Background" of the abuse-of-trust enhancement, which supports this assertion:

> *This adjustment applies to persons who abuse their positions of trust . . . to facilitate significantly the commission or concealment of a crime . . . Such persons generally are viewed as more culpable.*

U.S.S.G. § 3B1.3 cmt. background; *see also United States v. Garrison*, 133 F.3d 831, 839 n. 18 (11th Cir. 1998) ("Where an individual makes himself particularly vulnerable by entrusting another with substantial authority and discretion to act on his behalf and then relies upon and defers to that person, a decision to take advantage of that trust and vulnerability is particularly abhorrent, as it undermines faith in one's fellow man in a way that the ordinary pickpocket simply cannot." (quoting *United States v. Ragland*, 72 F.3d 500, 502–03 (6th Cir. 1996))).

This case involves the abuse of trust of the employees of Bartleson Masonry, Inc. (Bartleson Masonry) and the concealment of such abuse that occurred in 2006, 2007, and 2008. The employees of Bartleson Masonry relied on the good will of a longtime employer and friend. That employer, the Defendant, Anthony Bartleson (Bartleson), had discretionary authority and control over the management of the employees' SIMPLE Individual Retirement Account (IRA) plan (the Plan),[14] and he was not subjected to supervision in his roles as co-owner, Vice President, Secretary, and Treasurer. Taking advantage of his lack of supervision, Bartleson betrayed his employees' trust. More specifically, Bartleson took advantage of his employees' trust by withholding money from the Plan. Once he stole the employees' money, Bartleson used the money for the company's and his own benefit.[15] Analogous to Baier's example of the surgeon and plumber, Bartleson later concealed his acts—acts performed deliberately against his employees' interests—under the guise that the acts were an honest and well-meaning exercise of his discretion and authority to keep the company financially afloat.[16]

---

[14] "'SIMPLE' stands for Savings Incentive Match Plan for Employees of Small Employers.'" *See Simons v. Midwest Telephone Sales and Service, Inc.*, 462 F.Supp.2d 1004, 1006 n.3 (D. Minn. 2006). "IRA is an acronym for Individual Retirement Account or Individual Retirement Annuity." *Id.* A SIMPLE IRA Plan is permitted under Internal Revenue Code § 408(p), "which uses IRAs as funding vehicles and which provides for employee elective deferrals, and either an employer contribution of at least 2% or an employer match of at least 3% of compensation." 8B West's Legal Forms, Retirement Plans § 18:9 (5th ed.). "The arrangement may be established by an employer which had no more than 100 employees, taking into account only those employees who received at least $5,000 of compensation from the employer for the preceding year." *Id.*

[15] As explained below, the extent to which Bartleson spent the money of the employees of Bartleson Masonry for his and his family's personal use is in dispute.

[16] The Government's Brief In Support Of Its Supplemental Memorandum Regarding Sentencing (docket no. 25-1) provides compelling arguments which lead me to question

In this opinion, I address the sentence and restitution I ordered for Bartleson on February 6, 2015. I confront two issues in particular: (1) whether to apply the probation office's and prosecution's recommended additional two-level upward adjustment based on Bartleson's alleged abuse of a position of private trust under U.S.S.G. § 3B1.3;[17] and (2) whether Bartleson's criminal restitution order, pursuant to the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, shall also include the thirteen employees' lost investment earnings and tax liabilities incurred in 2007, in addition to the $41,878.22 already paid to the government by Bartleson.

---

the sincerity of Bartleson's need to embezzle money in order to keep the company afloat during difficult economic times. For example, the prosecution filed exhibits showing that Bartleson and his family members used the company's checking and credit card accounts for personal use and expenses during the years of 2006, 2007, and 2008. This evidence, as the prosecution points out, seems to conflict with Bartleson's need to embezzle funds from the employees to keep the business operating. One would expect that Bartleson would have ceased using company funds for frivolous and personal expenses before deciding to embezzle from his employees' retirement funds.

[17] Sentencing Guideline Section 3B1.3 provides in full:

> If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels. This adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic. If this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role).

U.S.S.G. § 3B1.3.

## II.  FACTUAL BACKGROUND

### A. Undisputed Facts

The facts below are undisputed and taken from the sentencing record.  In 1995, Bartleson and his brother, Stephen Bartleson, incorporated Bartleson Masonry in Iowa. The company conducted business in Forest City, Iowa.  It provided masonry services, and specialized in brick and block work.  Bartleson's brother served as the President, and Bartleson was Vice President, Secretary, and Treasurer.  Bartleson and his brother were the only two incorporators, shareholders, and directors of Bartleson Masonry. Bartleson had signatory authority on the company's bank accounts and handled payroll.

In 1997, Bartleson Masonry established and sponsored a SIMPLE IRA plan through the American Funds Group (American Funds).  The Plan allowed employees to make tax-free contributions through a salary deferral arrangement, and the Plan was subject to title I of the Employee Retirement Income Security Act of 1974.  In establishing the Plan, Bartleson Masonry promised to match employee contributions up to three percent of the employee's compensation for the calendar year.  In the beginning, Bartleson regularly deposited employer and employee contributions to the Plan. However, between March 2006 and March 2008, Bartleson withheld money from the pay of thirteen employees while performing his payroll responsibilities for the company.[18]

Instead of forwarding the employees' withheld pay to the IRA fund manager to deposit the funds into each respective employee's investment account, Bartleson retained the money in Bartleson Masonry's bank account.  Then, Bartleson used the employees' withholdings to pay for the company's operating expenses and to benefit Bartleson and

---

[18] According to the DOL Report, the company has since "dissolved, pursuant to Iowa Code, for failure to deliver its 2008 Biennial Report."  DOL Report at 5.

others.  Bartleson also failed to give the three-percent matching contribution from the company as promised.  In total, Bartleson embezzled $25,979.71 from thirteen employees' paychecks that were not forwarded to American Funds, and he failed to pay $15,898.51 in employer matching contributions.[19]

The Department of Labor (DOL) began its investigation of the Plan on March 10, 2008.  In 2013, the United States Attorney's Office (USAO) for the Northern District of Iowa notified Bartleson that the USAO planned to seek an indictment against him.  On May 5, 2014, Bartleson appeared before United States Magistrate Judge Leonard T. Strand.  That day, Bartleson pleaded guilty to one count of a one-count Information.  Count 1 charged Theft or Embezzlement From Employee Benefit Plan, in violation of 18 U.S.C. § 664.[20]  On May 6, 2014, I formally accepted Bartleson's plea.

---

[19] In order to reach an agreed upon restitution amount, the parties appear to have added these two loss amounts together, which equals $41,878.22.  The obvious flaw in this calculation is that it fails to account for the returns the Plan produced from the time of the embezzlement to the present date.  It also fails to account for the tax liabilities that the employees incurred for the 2007 tax year.

[20] Title 18, United States Code, Section 664 provides in full:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.
>
> As used in this section, the term "any employee welfare benefit plan or employee pension benefit plan" means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974.

### B. Disputed Facts

I will initially consider the contested facts in Bartleson's Presentence Investigation Report (PSIR) (docket no. 19) and his revised PSIR (docket no. 29), which includes the Department of Labor Report (DOL Report) (docket no. 29-1).[21] Both the PSIR and DOL Report indicate that Bartleson and his wife, brother, and father wrote checks on the company's checking account and used the company's credit cards for personal use.[22] *See* PSIR ¶ 9; *see also* DOL Report at 8. Spending company funds, the Bartlesons allegedly paid for phone bills; credit card payments; golf outings; and department store, pharmacy, and salon expenses. The family purchased season tickets to football games. The Bartlesons also paid for travel with company funds: the family went on trips to visit their children in college and Bartleson's father in Missouri, and they stayed at resorts in Punta Cana, Dominican Republic; Montego Bay, Jamaica; and Cancun, Mexico, and some local resorts. The DOL report notes that the Bartlesons even had timeshares in Cancun, Mexico, and Jason Thompson alleged that the Bartlesons owned homes in Mexico.

While under investigation by the DOL, the Bartleson brothers informed a DOL investigator that they, at times, did not receive paychecks in order to keep the company operating. Yet, their W-2 statements "[did] not indicate a decrease in wages for years

---

18 U.S.C. § 664.

[21] Because both PSIRs contain the same information, aside from the DOL Report, and numbering of paragraphs, when I cite to paragraphs in the PSIRs I do not differentiate between the two reports. Yet, I do specify when I cite to the DOL Report.

[22] The prosecution has bolstered these factual assertions by submitting an exhibit (*i.e.,* Government's Exhibit 1) (docket no. 25-2), which includes numerous checks signed by Bartleson and other members of his family from the company's business account, which appear to be for personal expenses. Additionally, the prosecution provided exhibits (*i.e.*, Government's Exhibits 2 and 3) (docket nos. 25-3, 25-4) that include account statements from Bartleson Masonry's credit card, which also appear to contain personal expenses.

2006 and 2007." DOL Report at 7. While their 2008 W-2 statements indicated a decrease in wages, the "Company's bank records and credit cards disclosed personal benefit [for the Bartlesons]." *Id*. The Bartlesons also continued to receive salaries during the same period that the employees' withdrawals were not forwarded to the Plan.

In addition, according to the DOL Report, the Bartlesons and the company have significant tax liens filed by the Iowa Department of Revenue and the Internal Revenue Service against them. *Id*. at 10. Bartleson also did not report the employees' withholdings from their wages as deferred income in 2007, or identify the Plan on the 2007 W-2 forms. Rather, the employees' contributions were considered earned income for tax purposes. Thus, not only did the employees "realize a loss to their SIMPLE IRA account" because their payroll deferrals were not forwarded to the Plan, but they also suffered taxes "for income they did not receive." *Id*. at 11.

In response, Bartleson takes issue with the PSIR and the DOL Report and allegations that the employees' withheld wages "were used to personally benefit the Bartlesons" and that the company's "accounts and credit cards were used *primarily* for personal use."[23] Defendant's Supplemental Objections To Revised Presentence Investigation Report (docket no. 30), 1. According to Bartleson, the employees' withheld funds were spent on the company's operating expenses and kept in the business's checking account. No evidence supports the PSIR's allegation that the Bartlesons used the funds primarily for personal expenses, says Bartleson. Bartleson furthers this claim in his brief objecting to the revised PSIR and DOL Report:

> Any small family-owned company that operates for over a decade, as Bartleson Masonry did, likely will have paid some expenses that benefited its owners. But that information

---

[23] At Bartleson's sentencing hearing, I sustained his objection to the factual assertion that he "*primarily* used Company bank accounts and credit cards for personal use" because that assertion was not proven by the prosecution. DOL Report at 11 (emphasis added).

> certainly does not support the DOL Report's inferences that
> all company expenses over a three-year period were to
> personally benefit the owners and that the company accounts
> were used *primarily* for personal use.

*Id.* 1. Bartleson objects to the report's "assumptions" that cell phone payments, football tickets, golf outings, and vacations were personal expenses. *Id.* at 2. Such payments were company-related expenses, and the expenses were used to benefit the employees, too. Additionally, Bartleson objects to the report's "assertion" that checks sent to Bartleson's father in Missouri were for his personal use when the home provided lodging for employees of the company when they worked on projects in Missouri. *Id.* The home was also offered to the employees as a place to vacation. In a footnote, Bartleson concedes that whether some of the business expenditures were "prudent business decisions is easy to question in hindsight"—namely, the Minnesota Vikings tickets, golf outings, and vacations. *Id.* at 2 n.1.

In Bartleson's most recently filed brief, he also "objects to the truth of the statements attributed to Jason Thompson," in particular, the allegation that the Bartlesons owned homes or timeshares in Cancun, Mexico. *Id.* at 4. "That statement is simply false," writes Bartleson. *Id.* Yet, Bartleson does admit to purchasing "a single time share [in Cancun, Mexico]—for their own benefit and with the idea that their employees could access time share opportunities." *Id.* The timeshare no longer has value, according to the Bartlesons, because they have not paid the annual maintenance fee on the timeshare or used the timeshare for years. Bartleson contends that the DOL Report also overvalues his home's market value based in part on his outstanding mortgage and overvalues the base price of his two vehicles. *Id.* at 3. He also disputes the allegation that he and his brother "took . . . over" Forest City Improvement Co., but fails to present any evidence to rebut that allegation. *Id.* at 3.

Additionally, Bartleson takes issue with the DOL Report regarding the W-2's for Bartleson Masonry employees for 2007. "The Appendix does not contain any of the W-2's for 2007, and Mr. Bartleson believes that the withholdings from Bartleson Masonry employee paychecks were properly reported on the W-2's as deferred income in that year."[24]  *Id.* at 4.   Nonetheless, Bartleson's brief continues: "At a minimum, if Mr. Bartleson failed to correctly report the employee contributions, that error was merely an accident. It was not done knowingly or intentionally." *Id.* Bartleson also asserts that he and his brother did not owe payroll taxes in their individual capacities at the time the DOL Report was written.   Rather, only Bartleson Masonry previously owed payroll taxes.  Without citing to any authority or evidence to support the claim, Bartleson added that, as of November 5, 2014, the company's payroll taxes were "repaid." *Id.* at 2.

Finally, Bartleson "objects to the calculation of 'lost earnings' in the DOL Report and its exhibits." *Id.* at 2–3.  According to Bartleson, the report does not explain its calculations nor account for individual statements, plan-wide statements, or historical information regarding the Plan.  For Bartleson, the DOL Report is merely a "theoretical loss calculation," which fails to calculate the "*actual* lost earnings" of the employees. *Id.* at 3.

---

[24] At paragraph 7, in both the original and revised PSIRs, it is provided that in 2007 "the defendant failed to report the employee contributions as deferred income."  PSIR ¶7. Bartleson failed to object to that factual assertion in the original PSIR, but objects to that same factual assertion in the DOL Report.

### C. Admissibility of the Department of Labor Report

Having reviewed Bartleson's main objections to the DOL Report above, I now discuss why it was appropriate for me to admit and consider the DOL Report at Bartleson's sentencing. As noted above, on October 22, 2014, Bartleson's PSIR was amended to include a seventy-two page DOL Report.[25] Bartleson filed two briefs with objections. One brief includes objections to factual assertions in the original PSIR (docket no. 17). The other brief incorporates Bartleson's previously filed objections and provides objections to the DOL Report, which is attached to the revised PSIR (docket no. 30). The prosecution did not file any objections as to the original or revised PSIR.

On December 22, 2014, in advance of Bartleson's sentencing hearing, I informed the parties in an order that I "tentatively decided to admit and consider the DOL Report at Bartleson's sentencing hearing, subject to any objections, rebuttals to the reliability of the report, or explanations as to the reports factual assertions." Order Regarding Department of Labor (DOL) Report (docket no. 31), 4. In that order, in accordance with precedent of the Eighth Circuit Court of Appeals, I held that Bartleson would "have the opportunity to 'rebut or explain' any disputed factual assertions in the DOL Report at his sentencing hearing." *Id.* at 5; *see also United States v. Rodriguez-Ramos*, 663 F.3d 356, 364 (8th Cir. 2011) ("The evidence need not be limited to evidence relating to the scope of the crimes charged and may include uncorroborated hearsay, provided the defendant is given a chance to rebut or explain it." (quoting *United States v. Pratt*, 533 F.3d 1165, 1170 (8th Cir. 2009))).

---

[25] The DOL Report is dated February 22, 2011, and that report appears to have formed the basis for the lawsuit for the USAO for the Northern District of Iowa against Bartleson. The description of Bartleson's criminal conduct in his PSIR also seems to be based in large part on the DOL Report.

I turn to briefly explain why, after considering Bartleson's objections in his supplemental brief and the evidence and arguments presented at Bartleson's sentencing hearing, I acted within my discretion to admit, consider, and rely on the DOL Report to sentence Bartleson and order restitution. Following my discussion of the lower standard for admitting and considering evidence at a sentencing hearing, I provide an overview of relevant case law on the kinds of investigative reports that courts have been permitted to consider at sentencings. In the end, I articulate the rationale underlying my decision to consider the DOL report at Bartleson's sentencing.

### 1. *Standard for Admissibility of Evidence at Sentencing*

"The standard of admissibility for evidence at sentencing is different than at trial. A preponderance-of-the-evidence standard applies at sentencing." *United States v. Monroy-Reynoso*, No. CR 12–1609, 2012 WL 6632594, *5 (D. N.M. Dec. 13, 2012) (citing *United States v. Manatau*, 647 F.3d 1048, 1054 n. 2 (10th Cir.2011); *United States v. Gomez–Arrellano*, 5 F.3d 464, 466 (10th Cir.1993)). Courts have been clear that the "appropriate standard" for admitting evidence at a sentencing "is substantially lower than that governing admissibility at trial." *United States v. McCaskey*, 9 F.3d 368, 380 (5th Cir. 1993). "Specifically, '[i]n resolving any reasonable dispute concerning a factor important to the sentencing determination, the court may consider relevant evidence without regard to its admissibility under the rules of evidence at trial, *provided that the information has sufficient indicia of reliability to support its probable accuracy.*'" *Id.* (emphasis added) (citing U.S.S.G. § 6A1.3(a)); *see also United States v. Postel*, 524 F.Supp.2d 1120, 1126 n.4 (N.D. Iowa 2006) ("Hearsay evidence remains admissible in sentencing as long as it bears some indicia of reliability." (citing *United States v. Morin*, 437 F.3d 777, 781 (8th Cir. 2006))). Evidence that has "sufficient indicia of reliability," pursuant to U.S.S.G. § 6A1.3, is "'reasonably trustworthy' in light of 'the totality of the circumstances.'" *See United States v. Romano*, 89 F. App'x 335, 336 (3d Cir. 2004)

(unpublished op.) (citing *United States v. Paulino*, 996 F.2d 1541, 1548 (3d Cir. 1993));
*see also United States v. Erger*, 19 F.3d 24, 1994 WL 47875, *2 (8th Cir. Feb. 18, 1994)
(*per curiam*) (unpublished op.) ("[E]vidence is reasonably trustworthy if it has a
'sufficient indicia of reliability.'" (quoting *United States v. Simmons*, 964 F.2d 763, 776
(8th Cir. 1992))).

### 2. Case Law on "Sufficient Indicia of Reliability"

In *Pepper v. United States*,[26] the United States Supreme Court explained, "Both
Congress and the Sentencing Commission thus expressly preserved the traditional
discretion of sentencing courts to 'conduct an inquiry broad in scope, largely unlimited
either as to the kind of information [they] may consider, or the source from which it may
come.'" 131 S. Ct. at 1240 (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972));
*see also* 18 U.S.C. § 3661 (Congress provides that "[n]o limitation shall be placed on the
information concerning the background, character, and conduct of a person convicted of
an offense which a court of the United States may receive and consider for the purpose
of imposing an appropriate sentence."). Following *Pepper*, the Eighth Circuit Court of

---

[26] In *Pepper v. United States*, the United States Supreme Court held that a district court
could "consider evidence of a defendant's postsentencing rehabilitation at resentencing
and such evidence may, in appropriate cases, support a downward variance from the
advisory Guidelines range." 131 S. Ct. 1229, 1241 (2011). Prior to the Supreme Court's
ruling, I sentenced the defendant for conspiracy to distribute 500 grams or more of
methamphetamine in violation of 21 U.S.C. § 846. After evidence of substantial
assistance and post-sentencing rehabilitation was presented to me, I resentenced the
defendant to 24 months. *Id*. at 1237. In doing so, I granted a 40 percent downward
departure based on his substantial assistance and a 59 percent downward variance based
on his rehabilitation. *Id*. The Supreme Court noted, "As the original sentencing judge
recognized, the extensive evidence of Pepper's rehabilitation since his initial sentencing
is clearly relevant to the selection of an appropriate sentence in this case." *Id*. at 1242.

Appeals, in *United States v. Rodriguez-Ramos*,[27] further elaborated upon the standard for what a sentencing court is permitted to consider at a defendant's sentencing hearing:

> Sentencing courts have "wide discretion at sentencing as to the kind of information considered or its source." *United States v. Pratt*, 553 F.3d 1165, 1170 (8th Cir.2009). A court may consider all relevant evidence at sentencing, regardless of its admissibility under the rules of evidence, provided that the evidence has "sufficient indicia of reliability." *United States v. Ortiz*, 636 F.3d 389, 393 (8th Cir.2011). The evidence need not be limited to evidence relating to the scope of the crimes charged and may include "uncorroborated hearsay, provided the defendant is given a chance to rebut or explain it." *United States v. Pratt*, 553 F.3d at 1170 (quoting *United States v. Atkins*, 250 F.3d 1203, 1213 (8th Cir.2001)). "[T]he sentencing process does not carry the same evidentiary protections guaranteed during a criminal trial." *Id.* (quoting *United States v. Agboola*, 417 F.3d 860, 865 (8th Cir.2005)).

663 F.3d at 364. Therefore, to be clear, a "sentencing court may consider any relevant information," such as information in a DOL Report regarding the investigation of the defendant's criminal conduct, as long as "the information has *sufficient indicia of reliability to support its probable accuracy*." *United States v. Fetlow*, 21 F.3d 243, 248 (8th Cir. 1994) (emphasis added) (citing *United States v. Granados*, 962 F.2d 767, 772 (8th Cir. 1992)).

Courts have held that information found in investigatory reports meet the standard of having "sufficient indicia of reliability." For instance, in *United States v. Mathews*,

---

[27] In *United States v. Rodriguez-Ramos*, the Eighth Circuit Court of Appeals held that the hearsay testimony of a DEA agent, that the defendant worked as a Mexican police officer and there were outstanding warrants for the defendant's arrest in Mexico, had "sufficient indicia of reliability" and the defendant "had the opportunity to rebut the same." 663 F.3d at 364. Thus, the appellate court determined that I did not err in considering the agent's testimony when sentencing the defendant for drug conspiracy offenses. *Id.*

the Eighth Circuit Court of Appeals affirmed a district court's decision to admit the government's laboratory reports at a sentencing hearing where the district court examined and determined that "[the reports] had sufficient indicia of reliability to be admitted for sentencing purposes." 19 F.3d 1438, 1994 WL 95960, *1 (8th Cir. Mar. 25, 1994) (*per curiam*) (unpublished op.). According to the appellate court, the results in the report "clearly and consistently identified the type of methamphetamine involved, and were contradicted only by [ ] uncertain testimony [of a co-conspirator and supplier, William Thomas]." *Id.* For that reason, the appellate court affirmed the district court's decision to admit the government reports at the defendant's sentencing.

In addition, in *Romano*, the defendant, a broker who misappropriated funds from some of his clients, pleaded guilty to mail fraud. 89 F. App'x at 336. There, the Third Circuit Court of Appeals held that the government's evidence relied upon by the district court at sentencing as to the victims' monetary losses reported in a revised PSIR, which were higher than the losses in the defendant's original PSIR and as stipulated to by the parties in the plea agreement,[28] had "sufficient indicia of reliability" as required by U.S.S.G. § 6A1.3. *Id.* at 337. This is because, according to the appellate court, "The additional losses were described in detail in FBI reports based on victim interviews corroborated by a raft of documents, checks and letters." *Id.* The defendant's sentencing colloquy with his counsel did not reveal that the defendant "wished to present contrary evidence and was denied an opportunity to do so; thus, the requirement of U.S.S.G. §

---

[28] The initial PSIR recommended a sentence based on the guideline range for a loss of $200,000 to $350,000. *Romano*, 89 F. App'x at 336. The revised PSIR calculated the loss at about $399,000, and it recommended a sentence based on the guideline range for a loss of $350,000 to $500,000. *Id.*

6A1.3(a) that 'parties shall be given an adequate opportunity to present information to the court regarding [a disputed sentencing] factor' was satisfied."[29] *Id.* at 336–37.

Although the Federal Rules of Evidence do not apply at sentencing hearings, FED. R. EVID. 1101(d)(3), it is worth noting that courts have also found Department of Labor reports admissible at trial based on their "trustworthiness" under FRE 803(8).[30] I refer to such case law to identify the analytical factors considered by courts when examining

---

[29] Like the Eighth and First Circuit Courts of Appeals, other courts have similarly relied on investigative reports at sentencings. *See, e.g.*, *United States v. Booher*, 242 F. App'x 952, 954 (4th Cir. 2007) (*per curiam*) (unpublished op.) (finding police reports, on which district court relied to determine firearm was stolen at sentencing, contained "sufficient indicia of reliability to support its probable accuracy") (quoting U.S.S.G. § 6A1.3(a)); *see also United States v. Leekins*, 493 F.3d 143, 151 (3d Cir. 2007) (finding sentencing court did not err by admitting and considering unsworn statements in police reports at the sentencing hearing where PSIR was based in part on the reports and the reports provided "sufficient indicia of reliability" of the officers' version of the shooting); *United States v. Marshall*, 894 F.2d 403, 1990 WL 2270, *3 (4th Cir. Jan. 11, 1990) (finding government's unverified police report that explained the basis of the defendant's conviction "reliable for sentencing purposes," and although defendant argued that the report was insufficiently reliable, defendant presented no evidence to rebut the report); *United States v. Adamson*, 26 F.3d 1186, 1994 WL 317566, *1 (D.C. Cir. June 15, 1994) (*per curiam*) (unpublished op.) (finding Drug Enforcement Agency report, which contained information regarding weight of drugs, was recited in PSIR, and relied upon by district court, had "sufficient indicia of reliability" to satisfy U.S.S.G. § 6A1.3).

[30] *See, e.g.*, *Ruiz v. Fernandez*, 949 F.Supp.2d 1055, 1063 (E.D. Wash. 2013) (DOL report was determined to be "trustworthy" and fell "within the hearsay exception set forth in [FRE 803(8)]" based on the court's analysis of four factors: "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation."); *see also Hotel Employees-Hotel Ass'n Pension Fund v. Timperio*, 622 F.Supp. 606, 608 (S.D. Fla. 1985) (finding work records and reports prepared by DOL, with respect to the audit of a pension fund's records, were admissible at trial under FRE 803(8) and 28 U.S.C. § 1732).

whether a DOL Report is "trustworthy" at trial. Those factors, in part, guide my analysis below that the DOL Report here meets the test of "sufficient indicia of reliability." *See Romano*, 89 F. App'x at 336.

### 3.     *DOL Report has "Sufficient Indicia of Reliability"*

In this case, numerous aspects of the report demonstrate the report's reliability and trustworthiness. First, the report was timely. The investigation occurred during the years 2008, 2009, and 2010, during which time Bartleson concedes that he embezzled funds from his employees. The report was completed and mailed to the USAO on February 22, 2011. Second, the DOL Report has an additional indicium of reliability in that it was prepared by LeeAnn King (King), a trained investigator of the Employee Benefits Security Administration (EBSA) of the DOL.[31] Third, King's summary of her various interviews and narrative report of events, which implicate Bartleson,[32] are corroborated by the exhibits attached to her report. Such exhibits include, among other things, a description of the conceded to crime that Bartleson committed; the funds withheld in 2006, 2007, and 2008 from the Plan that personally enriched Bartleson; a summary of the intended thirteen employee and employer contributions to the Plan and lost earnings; and the applications for the Plan to American Funds made by Anthony and Stephen Bartleson. Fourth, the report appears to be a final, as opposed to a preliminary or merely internal, draft with conclusions and recommendations made by EBSA's Criminal Coordinator, Susan Bryars. Together, I found the report to be "detailed and

---

[31] The EBSA, as noted in the DOL Report, "is an agency within the U.S. Department of Labor that conducts investigations involving employee benefit plans." DOL Report at 3. The report contains an identifiable DOL case number (*i.e.*, Case No. 60–104078). *Id.*

[32] On April 1, 2008, in the beginning stages of her investigation, King conducted an onsite investigation of the Plan. King interviewed Anthony and Stephen Bartleson; Jason Thompson, the employee that alerted the EBSA that withheld employee wages were not being contributed to the Plan; and David Arndt, Bartleson Masonry's accountant.

convincing" and of sufficient reliability to be used at Bartleson's sentencing. *See United States v. Schlosser*, 558 F.3d 736, 740 (8th Cir. 2009) (finding "[s]everal aspects of the incident report demonstrate[d] sufficient indicia of reliability," and the police incident report was "quite 'detailed and convincing,'" and concluding that "[the defendant] failed to meet his burden of showing that the district court's reliance on the incident report during sentencing [rose] to the level of plain error.")

Nothing in the record suggests that the DOL Report was not made in the regular course of DOL's investigation, or that she was personally biased or untrustworthy in her investigative tactics. Rather, King was employed by the EBSA at the time she wrote the report. As a trained EBSA investigator, King's job was to ensure the accuracy of her reporting based on the information discovered by her. Therefore, it is reasonable to assume that King had an interest in ensuring that her investigative report was truthful.

Finally, as noted above, Bartleson had the opportunity to "rebut and explain" the DOL Report's factual assertions at his sentencing. *See Rodriguez-Ramos*, 663 F.3d at 364. However, to the extent Bartleson's objections in his supplemental brief, or the evidence submitted at his sentencing hearing, were meant to weaken the reliability or trustworthiness of the report, I was unpersuaded. Bartleson did not present any evidence to seriously question the veracity of the report.[33] The DOL Report is internally consistent

---

[33] In reaching that decision, I overrule Bartleson's objections to the DOL Report discussed above, aside from the objection referred to in footnote 23. First, I never received evidence, such as tax returns, to support Bartleson's claim that payroll taxes were repaid. Second, I never received evidence, such as copies of any W-2 forms for 2007, to support Bartleson's claim that he "believes that the withholdings from Bartleson Masonry employee paychecks were properly reported on the W-2's as deferred income in [2007]." Defendant's Supplemental Objections To Revised Presentence Investigation Report at 4. Third, I never received affidavits attesting to the fact that employees or the company gleaned benefits from the football tickets, golf outings, vacations, clothing, phone bills,

and its description of Bartleson's criminal conduct is bolstered by the above-noted corroborating materials that accompany the report. Thus, below I rely on certain factual assertions in the DOL Report to address the issues presented in this case.

---

and mortgage paid for in part with the employees' wages. Nor were the numerous expenses that appear to be for personal use on Bartleson's company credit card statements explained. Fourth, I never received the Plan's individual account statements, which were also, presumably, not provided to King when she prepared the DOL Report. Therefore, it is paradoxical that Bartleson criticizes the DOL Report for relying solely on yearly intended employee contributions to the Plan, not "individual account statements or plan-wide statements." *Id.* at 3. Fifth, I have not received documentation regarding Bartleson's timeshare in Mexico, or the timeshare's closing process. Relatedly, Bartleson "objects to the truth of the statements attributed to Jason Thompson" in the DOL Report. *Id.* at 4. In Bartleson's words, "[I]n September 2014, Mr. Thompson asked to work with Mr. Bartleson again, which demonstrates that even the most vocal critic and victim of Mr. Bartleson's offense does not hold hard feelings against him." *Id.* I am not convinced that a former employee cannot have hard feelings over an employer embezzling money from the employee and still need a job. Sixth, I never received proof of a mortgage, or professional assessments of his home and vehicles. Seventh, Bartleson takes issue with the DOL Report's allegation that he "took . . . over" Forest City Improvement, but I never received any contrary evidence to refute the DOL Report's allegation and evidence. *Id.* at 3. According to the DOL Report, King gathered this information from an interview with Stephen Bartleson and a search of Winnebago County, Iowa Recorder of Deeds sites to determine ownership of two relevant properties, one of which included Bartleson on the deed. DOL Report at 10. At his sentencing, I permitted Bartleson (and gave him advance notice of such permission in an order dated December 22, 2014) to introduce evidence regarding his rebuttals or explanations to the factual assertions in the DOL Report. No such evidence was presented. Thus, I overrule all but one of Bartleson's objections to the DOL Report. I also make separate factual rulings regarding Bartleson's objections to the original and revised PSIR, which do not directly pertain to the DOL Report. Specifically, I make such findings in the body of the opinion as well as at footnotes 43, 48, 55, 75, and 78.

## III.   DISCUSSION

The key issues I confront below are: (1) whether Bartleson abused a position of private trust under U.S.S.G. § 3B1.3 as an owner and officer of Bartleson Masonry; and (2) whether to order Bartleson to pay restitution for the investment earnings and tax liabilities incurred by the thirteen employees under the MVRA, 18 U.S.C. § 3663A, in addition to the $41,878.22 Bartleson has already paid.

### A.   Standard for Abuse-of-Trust Enhancement

"If a defendant abuses a position of public or private trust in a manner that significantly facilitates his offense, then the Guideline's offense calculation should be increased by two levels." *Erhart*, 415 F.3d at 972 (citing U.S.S.G. § 3B1.3). "Whether the defendant *may* occupy a position of trust is a question of law; if so, whether [he] *did* is a question of fact." *United States v. Gilbert*, 721 F.3d 1000, 1007 (8th Cir. 2013) (quoting *United States v. Hayes*, 574 F.3d 460, 478 (8th Cir. 2009)). "[T]he issue is fact intensive because it turns on the precise relationship between the defendant and her victim and therefore cannot be decided on the basis of generalities such as 'lawyers and doctors occupy positions of trust but bank tellers and insurance agents do not.'" *United States v. Baker*, 200 F.3d 558, 564 (8th Cir. 2000).[34]

---

[34] In *Erhart*, *Gilbert*, and *Baker*, the Eighth Circuit Court of Appeals affirmed two-level enhancements by district courts for abuse of a position of trust. *See Erhart*, 514 F.3d at 972–73 (affirming abuse-of-trust enhancement for chiropractor who submitted false insurance claims); *see also Gilbert*, 721 F.3d at 1008 (affirming abuse-of-trust enhancement for police officer who used police radio to monitor law enforcement activity while his accomplices attempted to rob an armored truck); *Baker*, 200 F.3d at 564 (affirming abuse-of-trust enhancement for an independent contractor life insurance agent who received insurance premium payments from elderly clients and represented she would use the money to purchase insurance policies or annuities for them, but instead deposited the money in personal bank accounts and used it for her personal expenses).

The prosecution must prove three facts before the abuse-of-trust enhancement applies: (1) the defendant was in a position of private trust; (2) the defendant abused the position in a manner that significantly facilitated the commission or concealment of the offense; and (3) an abuse of trust is not included in the base offense level or a specific offense characteristic. *See United States v. Waldner*, 564 F.Supp.2d 911, 936 (N.D. Iowa 2008) (citing U.S.S.G. § 3B1.3) (applied two-level enhancement for abuse of a position of private trust because three facts presented: (1) defendant was CEO and sole owner of company with substantial discretionary judgment and control over company's operations and little to no supervision; (2) defendant used position of private trust to effectuate and conceal payments to insider corporations and his position gave him the authority to move funds and order others to move funds without questioning his illicit motives; and (3) defendant's abuse of trust was not included in the defendant's base offense level or a specific offense characteristic where the defendant pleaded guilty to two counts of making a false statement in relation to a bankruptcy proceeding, in violation of 18 U.S.C. § 152(3)).[35] Below, I address whether the prosecution proved the same three facts discussed in *Waldner*, following which I analyze the applicability of the Sentencing Guidelines' Commentary, Note 5, under § 3B1.3.

---

[35] The Eighth Circuit Court of Appeals affirmed the district court's two-level sentencing increase for the defendant's abuse of a position of trust, even though "the district court did not expressly discuss whose trust [the defendant] abused." *See United States v. Waldner*, 580 F.3d 699, 706–707 (8th Cir. 2009). "Nonetheless," the appellate court wrote, "the record demonstrates that Waldner abused the trust of H & W's creditors when he committed fraud at the Section 341 creditors meeting." *Id.*

### B. Parties' Arguments as to Abuse-of-Trust Enhancement

The arguments below are drawn from the parties' sentencing memorandums and Bartleson's two briefs objecting to the original and revised PSIR. In Bartleson's brief objecting to the original PSIR, he argues, "There is no factual basis for applying the position-of-trust adjustment in this case." Defendant's Objections To Presentence Report (docket no. 17), 2. Citing to U.S.S.G. § 3B1.1, Bartleson contends that he did not occupy a position of trust in relation to the victims, *i.e.*, the company's employees. Bartleson notes that a position of private trust is "characterized by professional or managerial discretion," and suggests he had no such discretion. *Id.*

Bartleson argues that he was not appointed to hold any position of trust by the employees of Bartleson Masonry. Rather, he argues that he was a mere "bookkeeper in a small construction company." *Id.* Bartleson argues that, as a bookkeeper, his position "did not involve any professional or managerial discretion with respect to the IRA contributions." *Id.* In his reply brief to the prosecution's sentencing memorandum, Bartleson contends that his "duty to transfer money to the IRA plan" is parallel to the "bank teller's duty to transfer money to the correct account." Defendant's Reply To Government's Memorandum Regarding Sentencing (docket no. 23), 1–2. Although he had a responsibility to transfer the employees' IRA contributions to the IRA plan in his position, he "did not exercise any discretion vis-à-vis the IRA plan," such as how much the employees gave to the plan, or "what funds were purchased with the IRA contributions." *Id.* at 2. Rather, Bartleson argues, his responsibility with respect to the Plan was "purely ministerial." *Id.*

Bartleson also argues that his position did not significantly contribute to facilitating the commission or concealment of the offense. Citing to a case written by the Third Circuit Court of Appeals, Bartleson asserts that the abuse-of-trust enhancement "is

primarily aimed at positions that provide 'freedom to commit a difficult-to-detect wrong.'" Defendant's Objections To Presentence Report at 3 (citing *United States v. Lieberman*, 971 F.2d 989, 993 (3d Cir. 1992)).[36] In doing so, he implies that his position did not provide such freedom. This is because the employees had access to their IRAs, and "they could presumably see on IRA statements whether contributions were being made." *Id*. Bartleson goes so far as to say that he "was open with his employees about the status of the IRA contributions and his plans to make up any missed contributions."

---

[36] Although Bartleson refers to *Lieberman* solely in support of this legal proposition, the case stands as negative authority to Bartleson's position. Here's why: in remanding the district court's sentencing decision, the Third Circuit Court of Appeals held that the defendant *was* subject to an increase in his offense level under the Sentencing Guidelines for abuse of a position of trust. *Lieberman*, 971 F.2d at 994. The appellate court reasoned, "We find that the district court's holding that U.S.S.G. § 3B1.3 is not applicable to Lieberman cannot be upheld, and we will remand with directions to add the appropriate two-level increase." *Id*. In *Lieberman*, the defendant was a vice president of a bank, who pleaded guilty to bank embezzlement, in violation of 18 U.S.C. § 656 and 18 U.S.C. § 2, and attempted income tax evasion, in violation of 26 U.S.C. § 7201. *Id*. at 990. One of the defendant's duties was to balance the bank's suspense account. *Id*. at 991. However, no one else was watching the suspense account, and from late 1985 to early 1990, the defendant transferred money in approximately 36 separate transactions from the bank's suspense account into his own checking account without getting caught. *Id*. Based on these facts, the appellate court was persuaded that the defendant "was placed in a position to commit a 'difficult-to-detect wrong.'" *Id*. at 993. Additionally, the appellate court decided that "the apparent ease with which [the defendant] was able to effect the crime over a four-year period shows the nexus between the position of trust which he held and the commission and concealment of the embezzlement." *Id*. The fact that the defendant "was only one of 40 vice presidents of the bank, that he merely transferred the funds from one account to another, and that the detection of missing funds occurred in a routine examination" did not influence the appellate court to reach a different conclusion. *Id*. Because the defendant was the only employee in charge of the suspense account, and he accomplished his embezzlement by transferring money from that account for four years, the court decided it was "clear that [the defendant's] position of trust contributed in a substantial way toward both the commission and the concealment of the offense." *Id*. at 994.

*Id.* Finally, Bartleson contends that, if I apply the abuse-of-trust enhancement, I will improperly duplicate his base offense level because his "base offense level already accounts for the nature of his relationship with the victims." *Id.* at 4.

In reply, the prosecution contends that Bartleson occupied a position of trust with respect to his victims because he was co-owner, Vice President, Secretary, and Treasurer of Bartleson Masonry, "had managerial discretion," and "was essentially free from supervision." Government's Brief In Support Of Its Memorandum Regarding Sentencing (docket no. 20-1), 4. "His position of trust was enhanced by having signature authority on the company's bank accounts and by being the individual who handled payroll." *Id.* The prosecution further argues that trust inhered in the relationship because the employees trusted Bartleson to pay them and forward the money they elected to withhold to the Plan. According to the prosecution, the relationship between Bartleson and his employees was "akin to a fiduciary relationship." *Id.*

It is immaterial, the prosecution suggests, that the employees did not appoint or authorize Bartleson to hold a position of trust. This is because § 3B1.3 only requires that Bartleson occupy a position of trust, not that the victims of the offense "appointed or authorized" him to hold the position. *Id.* at 4–5. Based on the responsibility Bartleson held at the company and the lack of oversight of Bartleson's actions, the prosecution argues that Bartleson was much more than a mere bookkeeper. Moreover, in his various roles, "no one look[ed] over [Bartleson's] shoulder to ensure he was handling the money." *Id.* at 5. Because Bartleson was in a position where no one monitored his forwarding of the IRA withholdings, the prosecution argues, "he had the discretion, the ability, to not do so for years without getting caught." *Id.*

In addition, the prosecution contends that Bartleson's "position of trust significantly facilitated his commission and concealment of the offense of embezzlement." *Id.* at 6. This is because Bartleson's various positions enabled him to

have the opportunity to access and embezzle the IRA funds, and conceal his embezzlement. No employees at the company provided oversight of Bartleson's actions or the company's finances to ensure Bartleson was contributing money to the Plan. Contrary to what Bartleson suggests, the prosecution contends that the abuse-of-trust enhancement does not require a person in a position of private trust "to conceal the offense from everyone, only that it significantly facilitate concealment," which occurred here. *Id.* at 6–7. Lastly, the prosecution argues that a two-level increase for abuse of a position of trust is not duplicative "because the base offense level in this case does not account for defendant's abuse of his position in the company"; rather, it only accounts for him committing a fraud. *Id.* at 7.

### C. Analysis Regarding Abuse-of-Trust Enhancement

#### 1. Bartleson Occupied a Position of Private Trust

Any job constitutes a position of trust in some sense, but "the guideline definition requires something more than a mere employment relationship to warrant an upward adjustment." *United States v. Brelsford*, 982 F.2d 269, 271 (8th Cir. 1992). The Commentary to Sentencing Guideline § 3B1.3 defines a position of private trust as a position that is:

> characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

U.S.S.G. § 3B1.3, cmt. (n. 1). As noted above, the Eighth Circuit Court of Appeals has explained that "[w]hether a defendant holds a position of trust with respect to a victim . . . turns on the nature of the defendant's position and amount of discretion and control

relative to the victim, not whether the victim subjectively trusted the defendant." *Miell*, 661 F.3d at 999.

In *Brelsford*, the Eighth Circuit Court of Appeals affirmed a district court's decision to increase the defendant's offense level two points for abuse of a position of private trust. 982 F.2d at 272. In that case, the appellate court reasoned that when considering whether a person occupies a position of private trust, "[t]he relevant inquiry under the guidelines is whether trust is inherent to the nature of the position." *Id.* (citing *United States v. Claymore*, 978 F.2d 421, 423 (8th Cir. 1992)). In reaching the decision that the defendant occupied a position of private trust, the court noted that the defendant "was not an ordinary [bank] teller; she was a [bank] teller supervisor." *Id.* The defendant monitored other tellers, and the bank trusted the defendant "to review the daily reports, to conduct regular audits, to assign the teller drawers, and to safeguard the keys to idle teller drawers." *Id.* "The fact that no one looked over her shoulder is itself evidence that she held a position of trust." *Id.* Thus, the appellate court affirmed the district court's conclusion that the defendant held a position of private trust. *Id.*[37]

Here, Bartleson was in a position of private trust by virtue of being a co-owner of Bartleson Masonry and serving as Vice President, Secretary, and Treasurer.[38] Bartleson

---

[37] The Eighth Circuit Court of Appeals also affirmed the district court's findings that the defendant used her position "in a manner that significantly facilitated the commission or concealment of the offense." *Brelsford*, 982 F.2d at 272. According to the appellate court, the district court did not err in finding that the defendant abused her position of trust. More specifically, the defendant used a key to a reserve drawer to facilitate her offense, and she used her position, as teller supervisor, to conceal her offense by falsifying reports and ensuring the reserve drawer was not assigned to another teller. *Id.* at 272–73.

[38] *See United States v. Olson*, 22 F.3d 783, 786–87 (8th Cir. 1994) (holding that a defendant's position as a vice-president in charge of a corporate lending division was a

also obtained a college degree in accounting, and, as Treasurer, he was trusted to accurately account for the finances of Bartleson Masonry and payroll.[39]  He also had signatory authority on the company's bank accounts.  Like the defendant in *Brelsford*, the record reflects that trust inhered in the relationship between Bartleson and the employees because of his responsibilities at the company.  For example, the employees of Bartleson Masonry trusted Bartleson to forward the employees' contributions to the Plan.  Bartleson was also responsible for making decisions regarding corporate disbursements.  He had substantial managerial discretion over the employees' IRA funds because, much like a professional trustee or fiduciary, he was in charge of forwarding the funds to a plan manager.  Therefore, contrary to Bartleson's claim, he was no mere bookkeeper.[40]

---

"position of trust for purposes of § 3B1.3," and finding that the three defendants "used their positions significantly to facilitate the commission of their crimes and to conceal their criminal activity," the court concluded that the "district court's findings that the appellants did not abuse positions of private trust [were] clearly erroneous."); *see also United States v. Valenti*, 60 F.3d 941, 947 (2d Cir. 1995) (affirming two-level enhancement for abuse of a position of trust where defendant was a Treasurer of an association from which he embezzled funds, "[h]e had authority to issue checks on his own signature under $1,000," "was responsible for the financial records," and "had sole possession of the checkbook.").

[39] The DOL Report provides that Bartleson Masonry also used an outside accountant, David K. Arndt (Arndt), who provided the 2008 W-2 statements to the DOL.  The record is unclear as to how often, and to what extent, Arndt provided accounting services.

[40] Even if Bartleson was a mere bookkeeper, bookkeepers are not immune from occupying a "position of trust" and abusing it, especially when they are subjected to little or no supervision.  *See, e.g.*, *United States v. Berkman*, 433 F. App'x 859, 866 (11th Cir. 2011) (finding two-level enhancement of defendant's offense for abuse of trust applied and noting that "[w]hile all bookkeepers are entrusted with sensitive banking information, the evidence in this case suggests that [the defendant] enjoyed an unusually low level of

In addition, as indicated in the PSIR, Bartleson was only subject to supervision (if at all) by his brother, who was the President of the company.[41] Bartleson was subject to far less supervision than the company's lower-ranked employees. It is also not unreasonable to assume that Bartleson's personal relationship with many of the employees also led to the employees putting more trust in Bartleson than they would have in a stranger, which also resulted in less supervision and more autonomy for Bartleson. Influenced by the reasoning of the Eighth Circuit Court of Appeals in *Brelsford*, I find "[t]he fact that no one looked over [Bartleson's] shoulder is itself evidence that [he] held a position of trust." *See Brelsford*, 982 F.2d at 272. In his position of trust, Bartleson withheld the employees' pay distributions from the Plan for years, and presumably, the illegal conduct would have continued had the crimes not been discovered by one employee, Jason Thompson.[42] Therefore, because trust inhered in Bartleson's

---

supervision in managing the B2B bank account," which "enabled her both to commit the offense and to conceal it for a substantial period of time.").

[41] The PSIR provides in relevant part:

> A review of the discovery file did not reveal any evidence that the defendant was subject to any supervision at all. The evidence does reflect that the co-owner and president of the company, the defendant's brother, was aware that the IRA Plan was behind, but was not aware of how far behind it was.

PSIR ¶ 18. When interviewed by a DOL investigator on April 2, 2008, Bartleson's brother was "unaware of his own IRA balance and hadn't looked at his personal account in a long time." DOL Report at 7.

[42] The DOL Report notes that the "EBSA opened its investigation on March 10, 2008, after our office received a participant complaint from an employee of the Company stating that employee contributions were not being forwarded to their account at American Funds." DOL Report at 7.

relationship, his position carried with it supervisory authority, and he had considerable deference, Bartleson occupied a position of private trust within the meaning of section 3B1.3. *See* U.S.S.G. § 3B1.3.

Bartleson's attempt to analogize his position to that of a "bank teller," merely transferring money to the correct accounts, fails.[43] Bartleson's embezzlement, in his position at Bartleson Masonry, is distinct from the "embezzlement . . . by an ordinary bank teller or hotel clerk" to which this adjustment does not apply. *See* U.S.S.G. § 3B1.3 cmt. (n. 1)). The Commentary for the Sentencing Guidelines reads:

> This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the

---

[43] In reaching this conclusion, I overrule Bartleson's objection to paragraph 6 of the PSIR. *See* PSIR ¶ 6. Bartleson objects to the PSIR "to the extent that [the PSIR] is interpreted to mean that the employees specifically authorized Mr. Bartleson to do anything." *Id.* In his objection, Bartleson asserts that "the employees merely relied on their employer to forward the contributions—it made no difference to them who within Bartleson Masonry was responsible for forwarding the contributions." *Id.* I disagree. In Bartleson's various roles as co-owner, Vice President, Secretary, and Treasurer, his handling of payroll, his signatory authority over the company's bank account, and his handling of the employees' funds for the Plan, Bartleson had more discretion and responsibility over the Plan than he claims in his objection to paragraph 6. Based on a preponderance of the evidence, it is clear to me that the employees did not "merely rely" on Bartleson to "forward the contributions." *United States v. Bentley*, 492 F.Supp.2d 1050, 1054 (N.D. Iowa 2007) ("The Eighth Circuit Court of Appeals has repeatedly and unequivocally held that 'due process is satisfied when sentencing facts are found by a preponderance of the evidence.'" (quoting *United States v. Miller*, 214 F. App'x 630, 631 (8th Cir. 2007))). Rather, his role was far more significant: he calculated the appropriate withholdings from the employees' wages for the Plan, completed a summary form for the Plan, he had discretion to manage the Plan with no supervision, and alone managed the company's finances. Also, as noted below, it is immaterial whether or not the employees "specifically authorized" Bartleson to transfer their funds to the Plan to determine whether he held a position of private trust. *See Erhart*, 415 F.3d at 972.

> guise of an examination.  This adjustment does not apply in
> the case of an embezzlement or theft by an ordinary bank
> teller or hotel clerk because such positions are not
> characterized by the above-described factors.

*Id*.  It is true that Bartleson's position gave him direct access to large amounts of money,

like a bank teller's or hotel clerk's position.  However, as Treasurer, Bartleson was in

charge of the company's banking and budget preparations, and he had authority to write

company checks for payroll, use the company's credit card, and withhold employees' pay

for the Plan.

Furthermore, Bartleson was not supervised.  His position afforded him

substantially more discretion and subjected him to limited oversight, which, as discussed

below, contributed in a significant way to facilitating and concealing his embezzlement.

For these reasons, Bartleson's case "differs significantly from that of the 'ordinary bank

teller or hotel clerk' who is subject to penny-for-penny accounting at the end of each

day." *See United States v. Allen*, 201 F.3d 163, 166–67 (2d Cir. 2000) (applying abuse

of trust enhancement and distinguishing defendant's case from an "ordinary bank teller

or hotel clerk" where defendant had markedly similar "'broad responsibilities'" to

Bartleson and was not subjected to "regular or direct supervision"); *see also Valenti*, 60

F.3d at 947 (finding defendant's position, which was akin to Bartleson's position, "bore

little resemblance to 'the tight accounting controls that restrict a bank teller.'" (quoting

*United States v. Melendez*, 41 F.3d 797, 799 (2d Cir. 1994))).

Bartleson's other argument—*i.e.*, he was not in a position of trust because he was

not granted discretionary authority or authorized to do anything—is also unpersuasive.

415 F.3d at 972. In *Erhart*,[44] the defendant argued that "because he was not granted discretionary authority by the victim insurers, he was not afforded a 'professional' level of authority." *Id.* In affirming the district court's determination that the defendant did, in fact, abuse a position of trust, the Eighth Circuit Court of Appeals reasoned that "Erhart was a licensed chiropractor and, as such, he exercised substantial discretion in preparing and submitting bills and treatment notes." *Id.* Similarly, trust inhered in Bartleson's relationship with his employees to prepare and submit regular paychecks to each employee and send their withdrawals to the Plan. Even if the employees, like the insurance companies in *Erhart*, did not explicitly grant discretionary authority to Bartleson, he had substantial "managerial discretion" over the employees' funds. Like

---

[44] At the outset of my discussion on *Erhart*, it is worth noting that *Erhart* involved an arms-length commercial relationship in which the application of the abuse-of-trust enhancement was upheld. *Erhart*, 415 F.3d at 972. Normally, "'an arms-length commercial relationship will [. . .] not suffice for the enhancement to apply[.]'" *United States v. Rubashkin*, 718 F.Supp.2d 953, 980 (N.D. Iowa 2010) (quoting *Waldner*, 580 F.3d at 707 n.5). Courts have held that "[t]he enhancement is proper in an arms-length transaction when 'the defendant has broad discretion to act on behalf of the victim, and the victim believes the defendant will act in the victim's best interest.'" *Id.* (quoting *United States v. Blackwell*, 254 F. App'x 228, 230 (4th Cir. 2007)). Put differently, "'Application of the enhancement requires more than a mere showing that the victim had confidence in the defendant. Something more akin to a fiduciary function is required.'" *Id.* (quoting *Blackwell*, 254 F. App'x at 230). That said, courts have also held that there "can be an abuse of a position of trust even in the absence of a traditional fiduciary relationship between a defendant and a victim." *United States v. Septon*, 557 F.3d 934, 937–38 (8th Cir. 2009). This brief discussion enables me to reiterate a point made above: determining whether to apply the enhancement "is fact intensive because it turns on the precise relationship between the defendant and his victims[.]" *Rubashkin*, 718 F.Supp.2d at 980 (quoting *Waldner*, 580 F.3d at 707 n.5) (internal quotation marks omitted).

the defendant in *Erhart*, he "abused this trust for the specific purpose" of committing embezzlement. *Id.*

As a final point, Baier's analysis of trust and her suggestion that the concept of trust implicates varying degrees of discretion in the philosophical realm is useful when analyzing whether Bartleson occupied a position of private trust in the legal realm. Like the plumber, who is trusted and has discretion in repairing pipes, or the surgeon, who is trusted and has discretion in treating an amendable injury by surgical methods, Bartleson was trusted and had discretion over the employees' funds, the Plan, and the company's finances. *Trust* at 239. Bartleson decided when and how the business's expenses and distributions to the Plan were paid. If I consider their discretion and supervision (or lack thereof) to be equal,[45] here is what differentiates the abuse of trust by a plumber, a surgeon, and Bartleson: Bartleson's abuse of trust is *more morally reprehensive* because of his relationship to those that trusted him. For many of the employees, Bartleson not only occupied a position of private trust, he was also their friend.

### 2. Bartleson's Position Facilitated the Commission and Concealment of the Embezzlement

"Once the sentencing court has determined that a person occupies a position of private trust, 'the position of . . . trust must have contributed in some significant way to facilitating the commission or concealment of the offense . . .' before the enhancement may apply." *Waldner*, 580 F.3d at 760 (quoting U.S.S.G. § 3B1.3 cmt. (n. 1)). According to the Guidelines' Commentary, a position of trust facilitates the commission or concealment of an offense "[b]y making the detection of the offense or the defendant's responsibility for the offense more difficult." U.S.S.G. § 3B1.3 cmt. (n. 1).

---

[45] Of course, depending on the task performed, the uncertainties surrounding the performance of that task, and the valued goods or things entrusted to them, there are varying degrees to which a plumber and a surgeon are given discretion and monitored.

For instance, in *Waldner*, my colleague, Chief Judge Linda R. Reade, held that a "[d]efendant abused his position of private trust in a manner that significantly facilitated the commission and concealment of his offense." 564 F.Supp.2d at 936. There, the defendant was in a position of private trust as CEO of the company and sole shareholder for a time. "By virtue of his position, Defendant had substantial discretionary judgment." *Id*. He micromanaged the company's affairs; he told its president, "'You take care of the operation. I'll take care of the money.'" *Id*. Chief Judge Reade highlighted that the defendant was "subject to little to no supervision, and in any event, significantly less supervision than [the company's] non-discretionary employees." *Id*. In his unsupervised position, the defendant "effectuate[d] and conceal[ed] [ ] payments to [ ] insider corporations." *Id*. Chief Judge Reade explained that the defendant's position as CEO "gave him the authority to move funds and order others . . . to move funds without questioning his illicit motives." *Id*. "Defendant's position of private trust clearly made the detection of his offense and his responsibility therefore more difficult," wrote Chief Judge Reade. *Id*. (citing *United States v. Morris*, 18 F.3d 562, 568 (8th Cir. 1994)). After articulating why an abuse of trust is not included in the defendant's base offense level or specific offense characteristics, Chief Judge Reade held that the defendant "should receive a two-level increase, pursuant to U.S.S.G. § 3B1.3, because he abused a position of private trust." *Id*.

Likewise, Bartleson's roles—*i.e.*, as a co-owner and officer with responsibilities over the company's finances and payroll—contributed to him facilitating his embezzlement and enabled him to escape detection. He was subjected to little to no supervision over moving the company's finances, handling payroll, or managing the

company's books.[46]   All of the payroll was completed in-house by Bartleson, and he maintained the payroll with his own handwritten payroll logs, pay checks, and pay stubs.[47]   Like the defendant in *Waldner*, Bartleson had substantial discretion in his various roles, which made "the detection of his offense and his responsibility" for the embezzlement "more difficult."  *Id.*

The abuses of his position of trust contributed significantly to the facilitation of both the commission and concealment of Bartleson's embezzlement.  This is because, with his status in the company, his actions were shrouded with a presumption of regularity not afforded others.  *See United States v. Post*, 25 F.3d 599, 601 (8th Cir. 1994) (affirming district court's finding that defendant abused a position of public trust and finding defendant's "status as a licensed attorney shrouded the [fraudulent insurance] claims with a presumption of regularity, and thus contributed significantly to facilitating

---

[46] *See, e.g.*, *Miell*, 661 F.3d at 999 (finding defendant "used his essentially unreviewable position of authority to facilitate and conceal his fraud, as his possession of the deposits put him in a position of power relative to tenants.")

[47] The DOL Report provides other useful information for purposes of analyzing whether Bartleson abused a position of trust by withholding employee contributions and converting that money for other purposes.  For example, according to the DOL Report,

> [Bartleson] maintain[ed] payroll with handwritten payroll logs, pay checks, and pay stubs.  Several of the pay stubs have missing payroll dates and do not identify other deductions withheld from employees' pay making it difficult to know what the deductions are intended for.  Additionally, earnings and deductions reported on pay stubs differ in comparison with information provided on the payroll logs.

DOL Report at 11.

the commission of the fraud."); *see also* U.S.S.G. § 3B1.3, cmt. (n.1). As occurred in *Waldner*, no one questioned Bartleson's "illicit motives" in his position of authority; he was subjected to significantly less supervision than the non-discretionary employees. *See Waldner*, 580 F.3d at 706. Bartleson was able to make regular withdrawals from the company's account. He had discretion to use company assets and employees' wages, which were commingled with company assets, to pay for personal and company expenses.[48] Thus, Bartleson had precisely the kind of discretion articulated in Note 1 of the Commentary section of the Sentencing Guidelines, and it facilitated the commission

---

[48] In making this factual finding, I overrule Bartleson's objection to paragraph 9 of the PSIR. *See* PSIR ¶ 9. Bartleson asserts, "The defendant objects to paragraph 9 of the [PSIR] and contends that the paragraph 'improperly attributes to Mr. Bartleson alleged conduct by three other people (his wife, brother, and father) without any factual or legal basis for such attribution.' The defendant also states, 'There is no evidentiary or factual basis for this list of alleged personal expenses.'" *Id.* I disagree. The factual assertions in the PSIR regarding the personal expenses and inference that the embezzled funds were used, in part, to pay for the listed expenses are made because of the information provided in the DOL Report and in the record. For example, the prosecution's supplemental memorandum includes three exhibits: (1) Exhibit 1 includes copies of Bartleson Masonry checks (docket no. 25-2); (2) Exhibit 2 includes copies of Bartleson Masonry (Anthony Bartleson) credit card statements (docket no. 25-3); and (3) Exhibit 3 includes copies of Bartleson Masonry (Stephen Bartleson) credit card statements (docket no. 25-4). Government's Brief In Support Of Its Supplemental Memorandum Regarding Sentencing at 2–4. Contrary to Bartleson's objection, the prosecution's exhibits enable me to find that the company's funds were used for personal expenses that benefited Bartleson and his family by a preponderance of the evidence. *See Bentley*, 492 F.Supp.2d at 1054. Focusing on Exhibit 2 alone, Bartleson's various personal expenses included charges at different golf pro shops and clubs, various retail stores (including stores catering primarily to women costumers, such as Victoria's Secret, Forever 21, and Sephora, and it is not unreasonable for me to assume that the purchases at those stores were for Bartleson's wife or daughters), and resorts and hotels. There are also numerous food, hotel, and gas charges on the credit card statement, but I assume, for Bartleson's benefit, that the reason the prosecution did not raise these expenses is because the charges were actually used in furtherance of the company's goals.

and concealment of his crimes. *See* U.S.S.G. § 3B1.3, cmt. (n. 1) ("i.e., substantial discretionary judgment that is ordinarily given considerable deference.").

Like Baier's surgeon or plumber, who theoretically have the ability to conceal their mistakes or ill-will "by pretense" that their abuse of trust took place because of "an honest and well-meaning exercise of the discretion given to them," Bartleson concealed his ill-will by the same kind of pretense. *Trust* at 239–40. Bartleson alleges that he embezzled from the thirteen employees in order to keep the company solvent. To reflect upon Bartleson's excuse for embezzling from his employees elucidates the "special vulnerability" that, according to Baier, accompanies trust: "[V]ulnerability to not yet noticed harm, or to disguised ill will." *Trust* at 239.

For the sake of argument, consider Bartleson's claim that Bartleson Masonry employees "had access to their IRA accounts," and the employees "could presumably see on IRA statements whether contributions were being made." The gravamen of Bartleson's contention is that his position did not make the detection of or responsibility for the crime more difficult to detect. I disagree with him on two grounds.

First, the record does not support Bartleson's claim that his crime was uncovered by *employees*. No evidence, at least to which I am made aware by Bartleson, supports the argument that *employees* could easily detect when contributions were made (or not made) to the Plan. Instead, the DOL Report makes this point clear: *one employee*, Jason Thompson, discovered Bartleson's criminal conduct, which initiated the DOL's investigation on March 10, 2008. DOL Report at 7. Thus, Bartleson's claim that his embezzlement was not a "difficult-to-detect" crime is negated by the facts.

Second, even if it were the case that the employees had the chance to detect when contributions were made to the Plan, the fact that Bartleson was able to withhold money from thirteen employees in 2006, 2007, and 2008 before getting caught, contradicts any suggestion that the employees were regularly watching the contributions (or lack thereof)

to the Plan. *See Lieberman*, 971 F.2d at 999 (finding district court erred in not applying abuse of position of trust enhancement, reasoning that the fact that the defendant "was able to conduct approximately 36 transactions over more than four years before being caught . . . belies any suggestion that the bank was regularly watching over [the defendant's] handling of the suspense account," and "[i]t follows that [the defendant] was placed in a position to commit a 'difficult-to-detect wrong.'")

Similar to the defendant in *Lieberman*, Bartleson's position of trust contributed to the commission and concealment of his embezzlement, and he was placed in a position to commit a "difficult-to-detect wrong." *Id*. at 994. If the employees had examined Bartleson's withholdings and transfers of their funds to the Plan more closely, it is likely that Bartleson's embezzlement would have been discovered sooner. *See Erhart*, 415 F.3d at 972 ("If the insurance companies had exercised more control over [the defendant], then it is likely the fraud would have been discovered. This fraud continued as it did precisely *because* the insurance companies trusted [the defendant] and the accuracy of the claims that he supplied them."). Therefore, like the defendant in *Lieberman*, Bartleson occupied a position of trust at Bartleson Masonry within the meaning of U.S.S.G. § 3B1.3, and his position of trust contributed in a substantial way to facilitating and concealing his embezzlement from thirteen employees.

### 3.     Enhancement Would Not Cause Double Counting

The enhancement for abuse of trust "may not be employed if an abuse of trust . . . is included in the *base offense level* or *specific offense characteristic*." U.S.S.G. § 3B1.3 (emphasis added); *see also Waldner*, 580 F.3d at 707 ("'[S]entencing courts err when precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways.'" (quoting *United States v. Smith*, 516 F.3d 473, 476 (6th Cir. 2008))); *United States v. Levy*, 992 F.2d 1081, 1084 (10th Cir. 1993). Citing to *Waldner*, 580 F.3d at 707, Bartleson argues that "the position of trust enhancement cannot apply to

[him] because it would be duplicative with the base offense level." Defendant's Objections To Presentence Report at 3. According to Bartleson, all defendants convicted of embezzlement under 18 U.S.C. § 664 will occupy a position of trust. "[I]t is inconceivable that a defendant convicted of embezzlement under § 664 would not qualify for a position of trust enhancement." *Id.* Because Bartleson's "base offense level already accounts for the nature of his relationship with the victims," Bartleson argues that applying the abuse-of-trust enhancement is "improperly duplicative."[49] *Id.*

I do not agree. Double counting did not occur here. As directed by U.S.S.G. § 3B1.3, I considered the base offense level and specific offense characteristics assigned by the guidelines to the crime of conviction. Bartleson was convicted of embezzlement in violation of 18 U.S.C. § 664, assessed a base offense level under U.S.S.G. § 2B1.1(a)(2),[50] and assessed specific offense characteristics under U.S.S.G. § 2B1.1(b)(1)(D) and U.S.S.G. § 2B1.1(b)(2)(A)(i). The guideline "does not direct us to the elements of the offense itself." *Levy*, 992 F.2d at 1084; *see also United States v. Lange*, 918 F.2d 707, 710 (8th Cir. 1990) (noting "the [underlying criminal] statute does not . . . affect the base offense level or specific offense characteristic under the Sentencing Guidelines," and reversing and remanding defendant's sentence, finding he should have received a two-level enhancement for abuse of a position of public trust).

---

[49] Although Bartleson argues that abuse of trust is included in his base offense level, he does not explicitly argue that trust is reflected in the adjustments made pursuant to the specific offense characteristic provisions of § 2B1.1(b). Nevertheless, I also analyze and reject that possible interpretation of § 2B1.1.

[50] "§ 2B1.1. Larceny, Embezzlement, and Other Forms of Theft; Offenses Involving Stolen Property; Property Damage or Destruction; Fraud and Deceit; Forgery; Offenses Involving Altered or Counterfeit Instruments Other than Counterfeit Bearer Obligations of the United States." U.S.S.G § 2B1.1.

Bartleson's base offense level of six under U.S.S.G. § 2B1.1(a)(2) does not take into account an abuse of trust.[51] *See* PSIR ¶ 14; *see also* U.S.S.G. § 2B1.1; *Claymore*, 978 F.2d at 423 ("If an abuse of trust is so central to the crime that the abuse would be included in the base offense level, the increase under § 3B1.1 is not available." (citing *Lange*, 918 F.2d at 708–09)). Nor do the specific offense characteristics listed in § 2B1.1 include abuse of trust. *See* U.S.S.G. § 2B1.1; *see also Levy*, 992 F.2d at 1084.[52] Bartleson was assessed an additional eight points for special offense characteristics. *See* PSIR ¶ 15–16. Accordingly, at his sentencing, I found Bartleson's abuse of a position of trust under the Sentencing Guidelines is not incorporated into his base offense level or a specific offense characteristic.

Finally, "[w]hile embezzlers like [Bartleson] may indeed *breach* a duty of trust by fraudulently appropriating the property of another . . . an *abuse* of trust under the Guidelines requires something more." *See United States v. Georgiadis*, 933 F.2d 1219,

---

[51] U.S.S.G. § 2B1.1(a) provides:

    (a) Base Offense Level:

        (1) 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or

        (2) 6, otherwise.

U.S.S.G. § 2B1.1.

[52] The Tenth Circuit Court of Appeals refers to an older version of the Sentencing Guidelines under § 2B1.1 entitled, "Larceny, Embezzlement, and Other Forms of Theft." *See Levy*, 922 F.2d at 1084. Nonetheless, the appellate court's analysis and determination that "neither the offense level nor the specific offense characteristics assessed against [the defendant] under § 2B1.1 account for an abuse of trust" provide useful guidance. *Id.* The defendant in *Levy* was convicted of embezzlement in violation of 18 U.S.C. § 153, "Embezzlement by trustee or officer." *Id.*

1227 (3d Cir. 1991) (finding an abuse of a position of trust is not an element of embezzlement). Consider the decision of the Ninth Circuit Court of Appeals in *United States v. Christiansen*, where it affirmed the sentence and abuse-of-trust enhancement for the defendant who was convicted of embezzlement under 18 U.S.C. § 657. 958 F.2d 285, 287 (9th Cir. 1992). On appeal, the defendant argued that "because embezzlement involves a breach of trust, the enhancement should not be applied." *Id*. In reaching its decision, the Ninth Circuit Court of Appeals was influenced by the Third Circuit Court of Appeals in *Georgiadis*, 933 F.2d at 1225. *Id*. Taking guidance from its sister circuit, the Ninth Circuit Court of Appeals put forth this explanation for why it could apply the enhancement to an embezzler:

> The court [in *Georgiadis*] reasoned that an abuse of trust under the Guidelines required *more culpable conduct* than a breach of trust. [*Georgiadis*, 933 F.2d at 1225]. Under this interpretation, the enhancement could be applied to embezzlers when the breach of trust was particularly egregious. This interpretation reconciles the apparent contradiction between the Guidelines and the Commentary.
>
> In determining whether particular conduct constitutes a breach or an abuse of trust, courts must look to the role the position of trust played in facilitating the offense. The Commentary states that the enhancement may be applied only when the position of trust contributed in some "substantial" way to facilitating the crime. "Substantial" in this context has been interpreted to mean that, in addition to the elements of the crime, the defendant exploited the trust relationship to facilitate the offense. *See United States v. Hill*, 915 F.2d 502, 505 (9th Cir.1990).

*Christiansen*, 958 F.2d at 287–88 (emphasis added).[53]   The reasoning of the Third and Ninth Circuit Courts of Appeals buttress my finding that abuse of trust is not incorporated under Bartleson's offense of embezzlement.   I agree with the Third Circuit Court of Appeals in *Georgiadis*: "If the Commission meant for the enhancement not to be applied to all embezzlers because abuse of trust is already included in the crime of embezzlement, they would have no cause to single out 'ordinary bank tellers' in the Application Note."[54] *Georgiadis*, 933 F.2d at 1225 (citation omitted).

Therefore, contrary to Bartleson's assertion, it *is* conceivable that a defendant can be charged under 18 U.S.C. § 664 and not be in a position of private trust. Hypothetically, a low-level employee of Bartleson Masonry, who is heavily supervised and has far less managerial discretion than Bartleson, could commit the same offense under 18 U.S.C. § 664 and not be in a position of private trust.   This hypothetical serves to illustrate that the abuse-of-trust enhancement and the underlying offense of embezzlement penalize distinct aspects of Bartleson's criminal conduct and distinct harms.   *See Waldner*, 580 F.3d at 707 (noting that difference between the abuse-of-trust enhancement and an underlying offense of making false statements in relation to a

---

[53] The updated version of the Commentary for the Sentencing Guidelines uses the word "significant," not "substantial": "For this adjustment to apply, the position of public or private trust must have contributed in some *significant* way to facilitating the commission or concealment of the offense . . . " U.S.S.G. § 3B1.3 (emphasis added).

[54] The Commentary, accompanying section 3B1.3, provides: "This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors." U.S.S.G. § 3B1.3, cmt. (n.1).

bankruptcy proceeding). For the reasons above, at his sentencing, Bartleson's offense level was increased two points pursuant to U.S.S.G. § 3B1.3.[55]

### 4. Application of Note 5 of the Sentencing Guidelines under U.S.S.G. § 3B1.3

Note 5 of the Commentary for the Sentencing Guidelines under U.S.S.G. § 3B1.3 contains additional illustrations of an abuse of trust and the operation of the guidelines with respect to embezzlement from employee pensions. *See* U.S.S.G. § 3B1.3 (n. 5). Note 5 reads, in pertinent part:

> (A) If the offense involved theft or embezzlement from an *employee pension or welfare benefit plan* and *the defendant was a fiduciary of the benefit plan*, an adjustment under this section for abuse of a position of trust *will apply*.

U.S.S.G. § 3B1.3 (n. 5(A)) (emphasis added). The prosecution points to the examples referenced in Note 5 and implies that they apply here. However, the prosecution does not explicitly draw out the implication, advance the implication to the next analytical step, or develop this argument in writing.[56] As the prosecution could have reasonably argued,

---

[55] Because I find that the abuse-of-trust enhancement applies here, I overrule Bartleson's objections to paragraph 18 of the PSIR. *See* PSIR ¶ 18. My discussions above address Bartleson's three specific objections to the application of the abuse-of-trust enhancement. Bartleson argued that (1) he "was not in a position of trust vis-à-vis the victims," (2) his position did not "significantly contribute to facilitating the commission or concealment of the offense," and (3) applying the enhancement "would be duplicative with the base offense level." *Id.* I reject each argument for the above reasons.

[56] Citing to U.S.S.G. § 3B1.3, cmt. (n. 5), the prosecution merely asserts, "The Guidelines further provide two examples of situations where the abuse of a position of trust enhancement applies in cases where the defendant has embezzled from an employee pension plan – namely where the defendant is a fiduciary of the benefit plan or where the defendant embezzled from a labor union and was an officer in the union." Government's Brief In Support Of Its Memorandum Regarding Sentencing at 3.

but did not, if Bartleson was a "[f]iduciary of the benefit plan," and the SIMPLE IRA Plan is an "employee pension benefit plan," then the adjustment under U.S.S.G. § 3B1.3 "will apply" based on Note 5.  *See* U.S.S.G. § 3B1.3 (n. 5(A)).

In Bartleson's reply brief to the prosecution's sentencing memorandum, he criticizes the prosecution's reference to Note 5 of the Commentary: "The government's invocation of fiduciary status under ERISA is misplaced and actually supports Mr. Bartleson's argument."[57]  Defendant's Reply To Government's Memorandum Regarding Sentencing at 2.  Bartleson takes issue with the prosecution's claim that there was a "fiduciary relationship" between Bartleson and his employees.  *Id.*  Put another way, instead of arguing that the Plan is distinct from an "employee pension benefit plan," or exempt from the coverage of ERISA, as to the first clause of Note 5 of the Commentary,[58] Bartleson focuses on the second clause of Note 5 pertaining to whether "the defendant was a fiduciary of the benefit plan."  According to Bartleson, the prosecution's novel theory that Bartleson was in a fiduciary relationship with the employees of Bartleson Masonry,[59] "would transform employers and officers of employers into fiduciaries."  *Id.* at 2–3.  Bartleson writes, "[C]ourts have rejected the government's novel expansion of fiduciary status or § 3B1.3[.]"  *Id.* at 3.  Below I address each clause of Note 5 in turn.

---

[57] ERISA stands for the Employee Retirement Income Security Act of 1974.

[58] For the sake of completeness, I consider this argument even though Bartleson does not.

[59] Bartleson frames the prosecution's argument in this way: "The government contends that employers—and even officers of an employer (like Mr. Bartleson)—are in a fiduciary relationship with employees if they are 'in control of money the employees ha[ve] earned through their labor,' and if the employees 'trust' that the employer 'would pay them what they were owed.'"  Defendant's Reply To Government's Memorandum Regarding Sentencing at 2.

### a. First Clause of Note 5

With regard to the first clause of Note 5 (*i.e.*, "the offense involved . . . embezzlement from an employee pension . . . benefit plan"), the Commentary does not define "employee pension benefit plan." However, Note 5 of the Commentary refers to 29 U.S.C. § 1002(21)(A) for the purpose of defining a "[f]iduciary of the benefit plan," and that code section also defines "employee pension benefit plan." *See* 29 U.S.C. § 1002. ERISA defines "employee benefit plan" as including both "an employee welfare benefit plan," or "an employee pension benefit plan," or both. "An employee pension benefit plan" is defined as

> any plan . . . established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program--
>
> > (i) provides retirement income to employees, *or*
> >
> > (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

29 U.S.C. § 1002(2)(A) (emphasis added).

For example, in *Holdbrook v. California Federal Bank*, the federal district court for the Northern District of Texas determined that an employer retirement plan was an ERISA "employee pension benefit plan." 905 F.Supp. 367, 370 (N.D. Texas 1995).[60]

---

[60] *Holdbrook* arises out of the civil arena, but it pertains to a plaintiff employee, who brought an action against the defendant employer to recover retirement benefits after the

In reaching that decision, the court explained that the "exact prerequisites for a 'pension benefit plan' are not as clearly defined" as a "plan, fund or program."[61] *Id.* "However," according to the court, "at a minimum any plan, fund, or program under ERISA implies the existence of intended benefits, intended beneficiaries, a source of income and a procedure to apply for and to receive benefits." *Id.* Applying these factors, the court held that the benefits of the plan at issue were intended as "monthly income after retirement"; the participating employees were "the intended beneficiaries"; "the source of income was both employee and [employer] contributions"[62]; and "the procedures for receiving the benefits were governed by Section VII of the 75-page plan." *Id.* "Indeed, section 20.8 of the plan expressly states that '[a]ll legal questions pertaining to the Plan shall be determined in accordance with ERISA . . .'" *Id.* Thus, based on the above analysis, the court held that the defendant's plan was "clearly" an ERISA employee pension benefit plan. *Id.*

Here, the SIMPLE IRA Plan is an ERISA "employee pension benefit plan." This is because the Plan was established and maintained by an "employer." *See* 29 U.S.C. § 1002(5) (defining an "employer" as "any person acting directly as an employer, or

---

plaintiff was terminated from his position with the defendant. 905 F.Supp. at 368. After the case was removed to federal court, the district court for the Northern District of Texas held that the defendant's pension benefit plan was an ERISA plan and ERISA preempted all of the plaintiff's claims. *Id.* Accordingly, the court granted the employer's motion for summary judgment and plaintiff's claims were dismissed with prejudice. *Id.* at 371.

[61] "Courts have defined 'plan, fund or program' by synonyms. For example a 'plan, fund or program' is any arrangement, scheme, design or program of action." *Holdbrook*, 905 F.Supp. at 370.

[62] As discussed in greater detail below, "[C]ertain IRAs which have little or no employer involvement, including no employer contributions, are excluded from the definition of 'employee pension benefit plan'" under ERISA. *See Cline v. Indus. Maint. Eng'g & Contracting Co.*, 200 F.3d 1223, 1230 (9th Cir. 2000).

indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity."). Looking to the definition of an employee pension benefit plan under 29 U.S.C. § 1002(2)(A), the Plan was intended to give "retirement income to employees" *and* "result[ed] in a deferral of income by employees for periods extending to the termination of covered employment or beyond[.]" 29 U.S.C. § 1002(2)(A). Therefore, the SIMPLE IRA Plan in this case satisfies the definition under 29 U.S.C. § 1002(2)(A).

Considering the factors put forth in *Holdbrook*, the employees were the "intended beneficiaries," and the "source of the income" was based on "a deferral of income" and consisted of "contributions" from the employees *and* the employer. *See Holdbrook*, 905 F.Supp. at 370; *see also Altshuler v. Animal Hospitals, Ltd.*, 901 F.Supp.2d 269, 278 (D. Mass. 2012) (defendant employer withheld contributions to the plaintiff employee's SIMPLE IRA and the employee's SIMPLE IRA was an "employee benefit plan" within the scope of ERISA); *Fasco Industries, Inc. v. Mack*, 843 F.Supp. 1252, 1255 (N.D. Ill. 1994) (finding a Supplemental Executive Retirement Plan (SERP) to be an "employee pension benefit plan" based on the factors articulated under 29 U.S.C. § 1002(2)(A)). Thus, the SIMPLE IRA Plan is an "employee pension benefit plan" based on the definition under 29 U.S.C. § 1002(2)(A) and *Holdbrook*.

It is important to note that the definition portion of ERISA on "[e]mployee pension benefit plan" excludes some IRAs and includes other IRAs within the scope of ERISA. *See* 29 C.F.R. § 2510.3–2(d)(1).[63] Specifically, for purposes of title I of ERISA, the

---

[63] "An 'Individual Retirement Account' and an 'Individual Retirement Annuity,' commonly referred to as IRAs, are not defined in ERISA but rather in the Internal Revenue Code, 26 U.S.C. § 408(a) and (b)." *DeBasio v. LifeUSA Holdings, Inc.*, No. CIV.A. 98–3346, 1998 WL 546127, *2 (D. Minn. Aug. 27, 1998). SIMPLE IRA Plans

term "employee pension benefit plan" does not apply to an IRA if the IRA meets four specific requirements articulated under Title 29 § 2510.3–2(d). Under the heading "(d) Individual Retirement Accounts," Title 29 § 2510.3–2(d) provides:

> (1) For purposes of title I of the Act and this chapter, the terms "employee pension benefit plan" and "pension plan" *shall not include* an individual retirement account described in section 408(a) of the Code, an individual retirement annuity described in section 408(b) of the Internal Revenue Code of 1954 (hereinafter "the Code") and an individual retirement bond described in section 409 of the Code, provided that—
>
>> (i) *No contributions are made by the employer or employee association*;
>>
>> (ii) Participation is completely voluntary for employees or members;
>>
>> (iii) *The sole involvement of the employer or employee organization is without endorsement to permit the sponsor to publicize the program to employees or members, to collect contributions through payroll deductions or dues checkoffs and to remit them to the sponsor*; and
>>
>> (iv) The employer or employee organization receives no consideration in the form of cash or otherwise, other than reasonable compensation for services actually rendered in connection with payroll deductions or dues checkoffs.

---

are defined under 26 U.S.C. § 408(p). Therefore, 29 C.F.R. § 2510.3–2(d) would not prevent the IRA from being considered an "employee pension benefit plan" as it applies to IRAs described in sections 408(a), 408(b), and 409 of the Internal Revenue Code. 29 C.F.R. § 2510.3–2(d). Nevertheless, it is worth explaining why the SIMPLE IRA plan here is not prevented from being considered an "employee pension benefit plan" under ERISA for purposes of analyzing Note 5 of the Commentary.

29 C.F.R. § 2510.3–2(d)(1)(i)–(iv) (emphasis added).

Analyzing 29 C.F.R. § 2510.3–2(d), the Ninth Circuit Court of Appeals explained in *Cline v. Indus. Maint. Eng'g & Contracting Co.* that

> [t]he Regulations provide that certain "individual retirement accounts" or "individual retirement annuities," collectively "IRAs," fall within the scope of ERISA and others do not. 29 C.F.R. § 2510.3–2. *Under this regulation, certain IRAs which have little or no employer involvement, including no employer contributions, are excluded from the definition of "employee pension benefit plan" and thereby completely excluded from ERISA coverage.* Other IRAs fall within the definition of "employee pension benefit plan" and thereby come within the ken of ERISA. *See* 29 C.F.R. § 2510.3–2(d).

> Here, the parties agree that "*employer contributions" are made to the Plan*. Although there is some disagreement over the application of other portions of § 2510.3–2(d)(1), that disagreement is irrelevant because *any failure under § 2510.3–2(d)(1) establishes that the Plan is an "employee pension benefit plan" for the purposes of ERISA*.

200 F.3d at 1229 (emphasis added). Therefore, based on the analysis of the Ninth Circuit Court of Appeal of 29 C.F.R. § 2510.3–2(d), the court concluded that the IRA plan at issue was an "employee pension benefit plan." *Id*.

In this case, the SIMPLE IRA Plan does not meet the four requirements listed under 29 C.F.R. § 2510.3–2(d)(1) because the parties agree that contributions to the Plan were made by Bartleson Masonry *and* the employees, and the employer was involved by collecting contributions through the payroll deductions of the employees. *See* 29 C.F.R. § 2510.3–2(d)(1); *see also DeBasio*, 1998 WL 546127 at *2 (noting that "a particular IRA may or may not be an 'employee pension benefit plan' and "[t]he determining factor will be the role, if any, played by the employer"); 29 C.F.R. § 2510.3–2(d) (certain

IRAs deemed not to be an "employee pension benefit plan" where there are no employer contributions and limited employer involvement). Because the SIMPLE IRA Plan in this case failed to meet requirements under § 2510.3–2(d)(1), the Plan is an "employee pension benefit plan" for purposes of ERISA, and is not expressly excluded by ERISA. *Cline*, 200 F.3d at 1229.

As an alternative means of interpreting the term "employee pension benefit plan," I refer to the statute under which Bartleson is charged, *i.e.*, 18 U.S.C. § 664. That statute provides in relevant part that "[a]ny person who embezzles . . . assets of any . . . employee pension benefit plan . . . shall be fined under this title, or imprisoned not more than five years, or both." 18 U.S.C. § 664. The statute continues: "'Any . . . employee pension benefit plan' means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974." *Id*. Putting aside my analysis, above, as to whether the Plan falls under the ambit of ERISA, Bartleson's Plea Agreement, which he initiated and signed, indicates that "[t]he Plan was subject to Title I of the Employee Retirement Income Security Act of 1974 ('ERISA')." Plea Agreement (docket no. 6-1) ¶ 7(b). Therefore, the SIMPLE IRA Plan in this case is an "employee pension benefit plan" under the charging statute. *See* 18 U.S.C. § 664.

### b.    *Second Clause of Note 5*

With regards to the second clause of Note 5 (*i.e.*, "the defendant was a fiduciary of the benefit plan"), the Commentary refers to the definition of a "[f]iduciary of the benefit plan" under 29 U.S.C. § 1002(21)(A). That definition includes several alternative definitions of a "fiduciary," such as anyone who (1) "exercises any discretionary authority or control in respect to the management of such plan or exercises authority or control in respect to management or disposition of its assets,"[64] or (2) "renders investment

---

[64] The logical structure of 29 U.S.C. § 1002(21)(A)(i) is in the disjunctive.

advice for a fee or other direct or indirect compensation with respect to any moneys or other property of such plan, or has any authority or responsibility to do so," or (3) "has any discretionary authority or responsibility in the administration of such plan." U.S.S.G. § 3B1.3 (n. 5(A) (citing 29 U.S.C. § 1002(21)(A)).

In reference to the definitions of "fiduciary" under the guidelines, Bartleson falls under the first definition: he exercised discretionary authority and control in respect to the management of the Plan and exercised authority and control in respect to the management and disposition of the Plan's assets. In his roles as co-owner, Vice President, Secretary, and Treasurer, Bartleson had authority over the company's payroll, and he calculated the appropriate withholdings to employees' retirement plans and completed a summary form as to the Plan. He was given considerable deference in performing these tasks and subjected to no supervision. He used that position to facilitate stealing money from his employees. Instead of forwarding money to American Funds on a monthly basis, he deposited the employees' withdrawals in Bartleson Masonry's bank account. He then spent the funds on company and personal expenses. His authority to draw off that account, which included company revenue and employee withdrawals for the Plan, suggests significant managerial discretion. Thus, Bartleson fits the definition of a "fiduciary" under Note 5 vis-à-vis the Plan.

However, even if I assume, *arguendo*, that Bartleson does not fit one of the definitions of a "fiduciary" under Note 5 of the Commentary to the Sentencing Guidelines, the abuse-of-trust enhancement still applies based on my analysis above. *See Septon*, 557 F.3d at 937–38 ("We have also held there can be an abuse of a position of trust even in the absence of a traditional fiduciary relationship between a defendant and a victim."). This is based on my three-factor analysis as to why the enhancement applies here: (1) Bartleson held a position of private trust, (2) his abuse of that position significantly contributed to the commission and concealment of the charged offense, and

(3) an abuse of trust is not included in Bartleson's base offense level or specific offense characteristic.

Bartleson's reliance on certain cases in furtherance of the argument that Note 5 does not apply, such as *Fraser v. Fiduciary Trust Co. Int'l*, 417 F.Supp.2d 310, 321 (S.D.N.Y. 2006) and *Finkel v. Romanowicz*, 577 F.3d 79, 86–87 (2d Cir. 2009), is misplaced. Defendant's Reply To Government's Memorandum Regarding Sentencing at 3. For example, Bartleson relies on *Fraser* for the proposition that "a defendant's role as an executive of an employing company is, *standing alone*, insufficient to confer fiduciary status." *Id.* (emphasis added) (citing *Fraser*, 417 F.Supp.2d. at 321). However desperately Bartleson clings to this proposition, it does not detract from the conceded facts that Bartleson was not an executive of the employing company *standing alone*. Rather, Bartleson's various roles—as a co-owner, Vice President, Secretary, and Treasurer, his handling of payroll, his signatory authority over the company's bank account, and his handling of the employees' funds for the Plan—placed him in an unreviewable position of power. He also had significant managerial discretion over his employees' funds and the company's finances.

Additionally, Bartleson cites to *Finkel* for its holding that it is insufficient to establish a principal as an ERISA fiduciary, where the principal of an employer maintains employee 401(k) contributions in his general assets for the benefit of himself. *Finkel*, 577 F.3d at 89. As explained by the Second Circuit Court of Appeals in *Finkel*, "ERISA provides alternative definitions of 'fiduciary,'" including one "who 'exercises any discretionary authority or discretionary control respecting management of [an ERISA benefit] plan *or* exercises any authority or control respecting management or disposition of its assets.'" *Id.* at 85 (emphasis added) (citing 29 U.S.C. § 1002(21)(A)(i)). In reaching its decision, the appellate court reasoned that the Joint Board failed to allege

that the defendant "enjoyed authority or control over the management of 401(k) Plan assets." *Id*. at 86.

At first glance, *Finkel* appears to favor Bartleson's position. There, the defendant was alleged to have withheld employees' elective contributions to a 401(k) Plan and the funds were maintained by the company for the benefit of the defendant and the company instead of being remitted to the 401(k) Plan. Like Bartleson, the defendant in *Finkel*, by virtue of his position as an officer at a company, "exercised control over [the company's] assets, including the general assets with which withheld contributions [for the 401(k) Plan] [were] commingled." *Id*. at 85. In addition, the defendant did not inform employees that he had "failed and refused to remit the withheld contributions" from the employees' retirement accounts. *Id*.

However, in *Finkel*, as the Second Circuit Court of Appeals explained, the reason the Joint Board's claim that the defendant was a "fiduciary" under 29 U.S.C. § 1002(21)(A) failed at the district court level was because the Joint Board did not allege:

> "(1) [The defendant] had the authority to determine which
> company bills to pay and when; or (2) he 'exercise[d]' that
> authority by using the money from the unpaid contributions
> for company payments." [*Finkel v. Whiffen Elec. Co., Inc.*,
> No. 06 CV 1269, 2007 WL 1395562, at *2 (E.D. N.Y. May
> 14, 2007)] (quoting 29 U.S.C. § 1002(21)(A)(i)).

*Id*. at 85-86.[65] The Second Circuit Court of Appeals agreed with the district court's reasoning that the defendant did not have the requisite control or authority over plan

---

[65] In dismissing the action against the defendant, the district court in *Finkel* was persuaded by the decision of the Second Circuit Court of Appeals in *LoPresti v. Terwilliger*, 126 F.3d 34, 40 (2d Cir. 1997). *Finkel*, 2007 WL 1395562 at *1. In *LoPresti*, as the district court explained, the appellate court held that "one of two shareholder-officers of a company was an ERISA fiduciary of certain benefit plans, in the sense that he exercised

assets based on these two factors. *Id.* at 86. The appellate court reasoned that it had previously held that management or disposition of ERISA plan assets "'refers to the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on.'" *Id.* (quoting *Harris Trust & Sav. Bank v. John Hancock Mut. Life Ins. Co.*, 302 F.3d 18, 28 (2d Cir. 2002)). The Second Circuit Court of Appeals concluded that the Joint Board's allegations were "not sufficient to establish [the defendant's] status as a fiduciary." *Id.* at 87.

By contrast, here, the prosecution has alleged (and proven) that, as Treasurer, Bartleson engaged in activities that made him a fiduciary under § 1002(21)(A)(i)'s definition. Unlike the defendant in *Finkel*, Bartleson was responsible for making the decisions as to the corporate disbursements and determining which of the company's creditors or corporate expenses were paid and in what order. He also exercised his authority as Treasurer by managing the money from the withheld employee contributions. He decided to keep the company financially afloat by paying certain creditors, to pay back the Internal Revenue Service for money owed by the company, and to use employees' wages for personal expenses. Also distinct from the defendant in *Finkel*, Bartleson had the authority to use the commingled funds—*i.e.*, the company's funds and the withheld employees' wages—for general corporate purposes. He was in charge of

---

authority or control respecting management or disposition of the plans' assets, but that the other shareholder-officer was not." *Id.* (citing *LoPresti*, 126 F.3d at 40–41). In reaching that conclusion, the Second Circuit Court of Appeals "looked to which officer made company payments with plan assets." *Id.* "Both had the authority to sign checks on the company's account, . . . and both were aware that deductions were placed in the company's general accounts, . . . *but only one, the fiduciary, determined which creditors to pay and when, and used company funds to pay those creditors*[.]" *Id.* (emphasis added). As articulated by the district court in *Finkel*, the mere act of commingling is not enough to make one a fiduciary. *Id.* at *2.

both the financing for the company and managing and disposing of the Plan's assets to American Funds.

This case is more analogous to *United States v. Pavcovich*, 92 F. App'x 259, 261 (6th Cir. 2004). There, the Sixth Circuit Court of Appeals held that "a preponderance of the evidence show[ed] that [the defendant, the Assistant Vice President in the retail loss prevention department] held a fiduciary or trust-like relationship to a bank." *Id.* As the Sixth Circuit Court of Appeals explained,

> According to this court's precedent, and to the application notes in the Sentencing Guidelines themselves, the level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can be characterized as a trust position. The examples given in the application notes (physician, attorney, and fiduciary) imply that the inherent nature of the work itself should naturally convey a substantial degree of discretion to the defendant concerning how to properly administer the property of another or otherwise act in their best interest. *United States v. Tribble*, 206 F.3d 634, 637 (6th Cir.2000).

*Id.* at 260–61 (emphasis added). In reaching its decision that a preponderance of the evidence showed the defendant held a "fiduciary or trust-like relationship to the bank," the appellate court was persuaded by these facts: the defendant (1) "oversaw the daily operations of his department," (2) "was responsible for the agency and outsourcing of accounts," and (3) "enjoyed a substantial amount of managerial discretion over his department." *Id.* at 261. The appellate court affirmed the district court's decision to apply the abuse-of-trust enhancement. *Id.*

Similarly, like the defendant in *Pavcovich*, Bartleson not only handled and "oversaw" the company's operations and assets as Treasurer, but he also had "a substantial amount of managerial discretion" over the company's finances in regards to the Plan. *Id.* The employees of Bartleson Masonry relied on Bartleson to act in their

best interest. He alone was responsible for forwarding their contributions to the Plan. Bartleson would not have been in the position of managing the Plan if he were not trusted by the employees to properly remit the employees' wages to American Funds. Instead, Bartleson converted the employees' funds for purposes other than funding the Plan.

The facts of this case are actually more aggravating than *Pavcovich* because, unlike the defendant in *Pavcovich*, Bartleson was not one among many vice presidents at the company. Bartleson and his brother were the only owners and officers of the company. In their capacities, they had more control than the defendant in *Pavcovich*; they oversaw and controlled all aspects of Bartleson Masonry's operations. Bartleson was responsible for transferring money to the Plan and paying the mandatory employer matching contributions. Bartleson even conceded the significance of his role at the company when he was interviewed by an investigator from the DOL on March 18, 2008. After Bartleson failed to produce requested documents to the DOL investigator, Bartleson informed the investigator that "his responsibilities with the Plan included calculating the SIMPLE IRA withholdings, completing a summary form, and forwarding the monies to American Funds on a monthly basis." DOL Report at 7. Like the defendant in *Pavcovich*, who "administered the bank's property by negotiating to whom and at what price the charged-off accounts were to be sold" and thus "held a fiduciary or trust-like relationship to the bank," Bartleson administered the company's property by determining which creditors were paid and when the employees' withdrawals were allocated to the Plan. *Pavcovich*, 92 F. App'x at 261. Neither Pavcovich nor Bartleson were mere bank tellers. *See id.* Rather, both were in positions of trust, which they abused in order to facilitate and conceal their crimes.

For the reasons discussed above, I find that the SIMPLE IRA Plan falls under the category of an "employee pension benefit plan" under clause 1 of Note 5. In addition, I find that Bartleson engaged in, and had authority to engage in, activities that made him a

"fiduciary of the benefit plan" under clause 2 of Note 5. *See LoPresti*, 126 F.3d at 40 ("As this Court has recognized, Congress intended ERISA's definition of fiduciary 'to be broadly construed.'" (quoting *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir. 1987))). Thus, I find that the two-level enhancement for abuse of a position of trust applies in this case based on my analysis of the three-factor legal standard for an abuse-of-trust enhancement discussed in Sections C1 to C3 above and my analysis of Note 5 in Section C4. *See* U.S.S.G. § 3B1.3 (n. 5(A)).

## D. Restitution

Interestingly, this is the second case in the last few months in which I have determined what is considered the "full amount" of a victim's losses for restitution purposes. *See United States v. Weimer*, ___ F.Supp.3d ___, 2014 WL 6680892, *7 (N.D. Iowa November 25, 2014). "The Mandatory Victims Restitution Act (MVRA) requires a sentencing court to order a defendant to make restitution to the victim of the offense in the full amount of the victim's loss without consideration of the defendant's ability to pay." *Erhart*, 415 F.3d at 973 (citing 18 U.S.C. § 3664(f)(1)(A)); *see also United States v. Ruff*, 420 F.3d 772, 774 (8th Cir.2005) (citing 18 U.S.C. § 3664(f)(1)(A)). "Prior to the MVRA, sentencing courts were required to make a finding regarding a defendant's ability to pay." *Id.* Moreover, under the MVRA's predecessor—the Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663— district courts are *required* to consider the defendant's financial resources, and the granting of restitution is discretionary. *See United States v. Gordon*, 393 F.3d 1044, 1048 (9th Cir. 2004). "In 1996, Congress supplemented the VWPA by enacting the MVRA, 18 U.S.C. § 3663A, which requires the imposition of full restitution, without consideration of the defendant's economic condition, for crimes of violence and property offenses, including any offense committed by fraud or deceit." *United States v. Curran*,

460 F. App'x 722, 724 (9th Cir. 2011) (citing *United States v. De La Fuente*, 353 F.3d 766, 769 (9th Cir.2003); 18 U.S.C. § 3664(f)(1)(A)).

In this case, Bartleson's crime "plainly falls within the mandatory restitution requirement of the MVRA."[66] *See Weimer*, 2014 WL 6680892 at *3. This is because Bartleson pleaded guilty to a crime of embezzlement under Title 18 (*i.e.*, 18 U.S.C. § 664: Theft or embezzlement from employee benefit plan), Bartleson committed a crime that was indisputably committed by fraud or deceit, and Bartleson's crime caused more than one identifiable victim to suffer a pecuniary loss. *See id.* (citing 18 U.S.C. § 3663A(c)(l)(A)(ii), (B) (noting that a person convicted of or who pleaded guilty to charges for "an offense against property" under Title 18 "in which an identifiable victim or victims has suffered a … pecuniary loss" be ordered to make restitution to the victim)); *see also Miell*, 744 F.Supp.2d at 965 (citing 18 U.S.C. § 3663A(a)(1), (c)(1)).

Because the MVRA applies in this case, I was required to "order restitution to each victim in the full amount of each victim's losses . . . without consideration of the economic circumstances of the defendant." *See* 18 U.S.C. § 3664(f)(1)(A); *see also Curran*, 460 F. App'x at 724 (affirming district court's decision to apply the MVRA, and

---

[66] At the time of the signing of his plea agreement, Bartleson understood that his restitution payment was mandatory:

> Defendant agrees to pay $41,878.22 as restitution to all victims including relevant conduct victims. This amount includes restitution for any offenses dismissed as a result of this plea agreement and any offense(s) included as relevant conduct. Defendant understands that, because *restitution is mandatory*, the amount of restitution shall be imposed regardless of defendant's financial resources . . . Complete restitution shall be due and payable at or before the time of sentencing . . .

Plea Agreement ¶ 17 (emphasis added).

not consider defendant's financial condition, in order to determine defendant's restitution where defendant pleaded guilty to two counts of theft from an employee retirement plan, in violation of 18 U.S.C. § 664, and to two counts of filing false forms, in violation of title I of ERISA, 18 U.S.C. § 1027). Regarding the appropriate amount of restitution, the MVRA provides, in pertinent part, that a defendant shall pay to the victim an amount that is equal to:

> (i) [T]he greater of—
>
>> (I) the value of the [stolen] property on the date of the damage, loss, or destruction; or
>>
>> (II) the value of the property on the date of sentencing, less
>
> (ii) the value (as of the date the property is returned) of any part of the property that is returned;

18 U.S.C. § 3663A(b)(1)(B)(i). In calculating restitution, the MVRA does not permit "[s]peculation and rough justice." *United States v. Anderson*, 741 F.3d 938, 954 (9th Cir. 2013). However, "exact precision is not required and district courts have a degree of flexibility in accounting for a victim's complete losses; thus, *a 'reasonable estimate' will suffice*." *Id.* (emphasis added) (citation omitted).

### 1. Restitution Should Include Lost Investment Earnings and Tax Liabilities

A case arising out of the Second Circuit Court of Appeals, *United States v. Scott*, assisted me in addressing the specific issue of whether to include the thirteen victims' lost investment returns in Bartleson's restitution order. 321 F. App'x 71, 72 (2d Cir. 2009). There, the Second Circuit Court of Appeals affirmed the district court's decision that the amount of restitution under the MVRA may include the victims' lost investment earnings on assets lost as a result of the defendant's criminal conduct. In *Scott*, the defendant "stole his clients' assets from three retirement accounts," and "[h]ad the assets remained

in those accounts, two of the three accounts would have increased in value by the date of sentencing." *Id.* The victims' funds when stolen were invested in either a variable annuity or an IRA. *Id.* at 71. The appellate court reasoned that "when determining the appropriate amount of restitution, district courts must choose a valuation method that best accomplishes [the primary purpose of the MVRA, which is to make victims of crime whole by fully compensating victims for their losses]." *Id.* at 72. "[T]he actual value of the stolen property, the funds in the retirement accounts, at the time of sentencing was the nominal value of the stolen funds plus the subsequent investment gains lost as a result of the theft." *Id.* Therefore, the appellate court held that the district court, in determining the value of the stolen retirement assets, acted appropriately by including investment earnings that "would have accrued as of the date of sentencing." *Id.*[67]

In this case, in his plea agreement, Bartleson stipulated to pay restitution in the amount of $41,878.22, which equals the total amount of the employees' original investments, but does not include investment returns, or the tax liabilities the employees incurred for the 2007 tax year. At the time Bartleson signed his plea agreement, he tendered a check to the USAO for that entire restitution amount. However, as the parties are well aware, I found that figure dramatically undervalued the amount of money that

---

[67] In *Scott*, the defendant's restitution order was not issued until more than ninety days after his sentencing because, at the sentencing hearing, the court requested that the parties brief the issue of whether lost investment gains were applicable in the case. *See Scott*, 321 F. App'x at 72; *see also United States v. Scott*, No. 3:07-cr-00026 (D. Conn. 2008). I reviewed the order of restitution written by the United States District Court for the District of Connecticut, which was filed on February 8, 2008, after the parties briefed the aforementioned issue. *See Scott*, No. 3:07-cr-00026. That order does not provide the court's reasoning for how it specifically calculated the investment earnings that would have accrued as of the date of the defendant's sentencing. *Id.* I provide my rationale for approximating the loss amount here.

Bartleson embezzled from his employees, because it failed to approximate the employees' lost investment income or tax liabilities.

Based on *Scott* and the standard for calculating a restitution award under the MVRA, I found it appropriate to include the employees' lost investment earnings in the restitution order. *Scott*, 321 F. App'x at 72. To make a "reasonable estimate" as to the victims' actual losses, which includes the amount of lost investment income from the Plan, I used the Standard & Poor's 500 Stock Index (S&P 500) to calculate the appropriate returns.[68] *See Anderson*, 741 F.3d at 951. Other courts have used the S&P 500 as the appropriate benchmark for determining investment income losses, and the S&P 500 is the "most accurate reflection of the U.S. stock market today."[69]

---

[68] The S&P 500 "is a value-weighted index of prices of 425 industrials, 25 railroads, and 50 utilities, all of which are listed on the New York Stock Exchange." *The Institutional Investor Disclosure Act: An Analysis of the Consumer Benefits*, 83 YALE L. J. 1271, 1279 n.32 (1974).

[69] For example, in *In re Burghoff*, Judge Paul Kilburg of the United States Bankruptcy Court for the Northern District of Iowa confronted similar facts. There, a Chapter 7 debtor had promised to invest the plaintiffs' money, but instead, the debtor appropriated the funds and used them as if they were his own. *In re Burghoff*, 374 B.R. 672, 676 (N.D. Iowa 2007). Eventually, after misleading the plaintiffs about the status of their investments for years, the debtor admitted to the plaintiffs that "the partnership had no assets." *Id.* The debtor had deposited the plaintiffs' funds into a checking account, and the debtor made "regular withdrawals for personal and 'business' expenses." *Id.* In determining the appropriate damage award for the plaintiffs, Judge Kilburg wrote,

> The [plaintiffs] are entitled to receive the amount of their initial investment, $131,436, less the disbursements that Debtor made to them. Because [the plaintiffs] lost the use of their funds during the period of the partnership, they also are entitled to a *reasonable rate of return*. The Court agrees with Debtor's suggestion that the Standard and Poor's 500 Index

Furthermore, I calculated the employees' intended gains on their investments based on the assumption that their money would have been invested into a broad market index fund (*i.e.*, S&P 500). My calculations are meant to represent the employees' lost investment income from the time of the embezzlements to the present date. Because I was only provided the yearly employee and employer contributions (and not the individual account statements), and the employees intended to transfer funds to the Plan throughout the year, I used the midpoint of each year, or the closest date to the midpoint of each year,[70] to calculate the S&P 500 "beginning value," as opposed to the first trading day

---

provides a *reasonable guide* to what the [plaintiffs] might have earned in the market during the relevant period.

*Id.* at 679 (emphasis added). In *In re Burghoff*, a case *not* involving pension plans, Judge Kilburg decided to apply the S&P 500's "*total return*" version of the index—"which assumes dividends and capital gains are reinvested as they accrue"—because the plaintiffs did not receive dividend payments. *Id.* As explained below, attempting to account for the dividend payments for the employees, without accounting for brokerage fees and expenses, would overstate the employees' returns, and investments in pension plans are often matched with the S&P 500 because it is the "most accurate reflection of the U.S. stock market today." *The S&P 500 Index*, WELLS FARGO INVESTING BASICS, http://www.wellsfargoadvantagefunds.com/wfweb/wf/education/101/markets/sandp500 .jsp (last visited: December 23, 2014) ("Many consider the S&P 500 *the most accurate reflection of the U.S. stock market today*. This high regard has led many money managers and *pension plan administrators* to use it as a benchmark for judging the overall performance of their fund against the stock market.") (emphasis added).

[70] For the beginning values, I used the closing value of June 30, 2006, where July 1, 2006, fell on a weekend. I used the closing value of June 29, 2007, where June 30, 2007 and July 1, 2007, fell on a weekend. Finally, I used the closing value of June 30, 2008, where July 1, 2008, fell on a Tuesday because the closing value of June 30, 2008, which fell on a Monday, captured pre-market trading and is the true midpoint of that year. *See S&P 500*, YAHOO! FINANCE,

of each year. The S&P 500 "ending value" was based on a current date in the index prior to Bartleson's sentencing.[71]

In addition, I added to the restitution amount the additional taxes that the employees were forced to pay because Bartleson failed to report the employee contributions as deferred income in 2007. Specifically, here is what is alleged in the PSIR: "Also, for 2007, the defendant failed to report the employee contributions as deferred income. Therefore, not only were the employees' contributions not forwarded to their IRA plans, they were considered earned income for tax purposes." PSIR ¶ 7. Similarly, the DOL Report alleges: "[T]he Bartlesons withheld $11,984.28 in [sic] from the paychecks of their employees intended for Plan year 2007 and failed to report the withholdings as deferred income nor identify the Plan on the 2007 W-2's." DOL Report at 11. I calculated the employees' tax liabilities only for the 2007 taxable year because it is not alleged in the DOL Report or the PSIR that the employees wrongfully paid additional taxes in 2006 or 2008. The allegation that the employees wrongfully paid taxes in 2007 was also not refuted by Bartleson at his sentencing hearing.

---

http://finance.yahoo.com/q/hp?s=%5EGSPC+Historical+Prices (last visited: February 9, 2015).

[71] For the ending value, I used the ending value of January 14, 2015, which I used prior to the final editing stages of this opinion and that ending value preceded Bartleson's sentencing hearing on February 6, 2015. The closing value I used (*i.e.*, 2,011.27) is actually lower than the ending values that immediately preceded and followed Bartleson's sentencing hearing—February 5, 2015 and February 6, 2015 (*i.e.*, 2,062.52 and 2,055.47, respectively). *See S&P 500*, YAHOO! FINANCE, http://finance.yahoo.com/q/hp?s=%5EGSPC&a=00&b=14&c=2015&d=01&e=9&f=2015&g=d (last visited: February 9, 2015). Therefore, my estimation of the employees' lost investment earnings is a conservative estimate.

My calculations assume that the employees paid too much on their taxes as Bartleson overstated taxable earnings for his employees in 2007. If Bartleson reported the withheld funds as funds designated for the Plan, the employees' tax liabilities would have been reduced.

Stephen Bartleson's and Anthony Bartleson's W-2's for 2007 show wages of $38,500.00. *See* DOL Report at 8. Therefore, Bartleson, unless he filed his taxes separately from his wife, would have fallen under the 15% tax bracket for the 2007 taxable year.[72] The record does not indicate how much each of the thirteen employees earned for the 2007 taxable year. As a consequence, it is less clear what the appropriate tax bracket is for the thirteen employees.[73] For that reason, I simply applied the lowest tax rate for 2007 of 10%.[74] In total, Bartleson owes an additional $1,198.42 for the tax

---

[72] *See 2007 Tax Bracket Rates*, BANKRATE, http://www.bankrate.com/finance/money-guides/2007-tax-bracket-rates.aspx (last visited: December 30, 2014).

[73] Even without the employees' yearly salaries for 2007, I am able to determine what the employees are owed if I assume the employees were in the lowest tax bracket. Let me use Jason Thompson as an example. If I assume that he made $15,000.00 in 2007, and he paid 10% in taxes, the taxes he paid would have been $1,500.00. However, Thompson's assumed $15,000.00 of taxable earnings should have been reduced by the amount that he contributed to the Plan. In this case, he contributed $1,933.23. He should have paid 10% in taxes on $13,066.77 (*i.e.*, $15,000.00 minus $1,933.23), which would have equaled $1,306.68. Therefore, he incurred $193.32 (*i.e.*, $1,500.00 minus $1,306.68) as a tax liability for the year 2007. His tax liability of $193.32 is 10% of $1,933.23, the amount he initially contributed to the Plan. Therefore, to calculate the liabilities, I take 10% and multiply it by the amounts originally contributed to the Plan by each employee.

[74] Here are my calculations for estimating the thirteen employees' tax liabilities incurred for 2007: (1) Jason Thompson is owed $193.32, or 10% of $1,933.23. (2) Shane Wagner is owed $128.03, or 10% of $1,280.28. (3) Brad Rauk is owed $75.15, or 10% of $751.53. (4) Matt Slater is owed $212.99, or 10% of $2,129.92. (5) William Norton is

liabilities wrongfully incurred by the employees of Bartleson Masonry. This is a conservative estimate because I did not include additional state tax liability, and I applied the lowest federal tax rate for 2007.

To determine Bartleson's total restitution amount, I added the following: (1) what the employees would have made in investment income if their funds were invested based on the S&P 500 (*i.e.*, $19,640.57); (2) what the employees originally intended to contribute to the Plan based on the periodic withdrawals from their wages (*i.e.*, $41,878.22, as set forth in the DOL Report and Bartleson's plea agreement);[75] (3) what the employees would have saved on taxes for 2007 (*i.e.*, $1,198.42). In total, Bartleson's restitution order amounts to $62,717.21. Therefore, at his sentencing, I ordered Bartleson to pay restitution in the amount of $62,717.21, less $41,878.22, which he already paid, and so, he owes $20,838.99 at present.[76]

---

owed $123.56, or 10% of $1,235.63. (6) Hector Isern is owed $31.75, or 10% of $317.46. (7) Jason Berding is owed $88.83, or 10% of $888.33. (8) Daimon Perry is owed $47.91, or 10% of $479.07. (9) Eric Kruse is owed $74.33, or 10% of $743.28. (10) Jon Peterson is owed $126.02, or 10% of $1,260.23. (11) Seth Buck is owed $54.43, or 10% of $544.34. (12) Raul Tamayo is owed $42.10, or 10% of $420.98. (13) Scott Willert did not contribute to the Plan in 2007. In sum, the tax liabilities incurred by the employees in 2007 equals $1,198.42.

[75] In deciding the appropriate restitution amount for Bartleson, I overrule his objection to paragraph 3 of the PSIR that the PSIR "sells Mr. Bartleson short" as he "*already tendered* the full restitution amount ($41,878.22) to the government when the plea agreement was executed." Defendant's Objections To Presentence Report at 1. As stated in the PSIR, it is true that Bartleson has "agreed to pay full restitution." PSIR ¶ 3. However, as I made clear to the parties during a status conference on October 6, 2014, the agreed to restitution amount by the parties significantly undervalued the employees' losses. Status Conference (docket no. 27).

[76] More specifically, $20,838.99 is to be allocated as follows based on the employees' investment returns and tax liabilities: (1) Jason Thompson is owed $3,132.26 ($2,938.94

## 2. Payment Schedule for Restitution

Although I am not permitted to consider Bartleson's financial condition when imposing restitution under the MVRA, I am required to consider Bartleson's financial condition when fashioning a payment schedule for restitution pursuant to the new restitution act. *See* 18 U.S.C. § 3664(f)(2); *see also Weimer*, 2014 WL 6680892 at *14 ("Although a defendant's economic circumstances are not relevant to the determination of the *amount* of restitution, they are relevant to the *manner of payment* of restitution." (quoting *Miell*, 744 F.Supp.2d at 969))). I analyze the factors set forth under 18 U.S.C. § 3664(f)(2) to determine Bartleson's payment schedule for restitution, such as "the financial resources and other assets of the defendant, including whether any of these

---

+ $193.32); (2) Shane Wagner is owed $2,332.61 ($2,204.58 + $128.03); (3) Brad Rauk is owed $1,713.17 ($1,638.02 + $75.15); (4) Matt Slater is owed $3,315.88 ($3,102.89 + $212.99); (5) William Norton is owed $1,796.56 ($1,673.00 + $123.56); (6) Hector Isern is owed $219.48 ($187.73 + $31.75); (7) Jason Berding is owed $1,634.67 ($1,545.84 + $88.83); (8) Daimon Perry is owed $949.42 ($901.51 + $47.91); (9) Eric Kruse is owed $1,371.98 ($1,297.65 + $74.33); (10) Jon Peterson is owed $1,947.72 ($1,821.70 + $126.02); (11) Seth Buck is owed $1,096.97 ($1,042.54 + $54.43); (12) Raul Tamayo is owed $841.36 ($799.26 + $42.10); and (13) Scott Willert is owed $486.91 in investment returns but zero dollars in tax liabilities. If one adds together the thirteen separate amounts owed, based on investment returns and tax liabilities, the total is $20,838.99. The Appendix consists of two Microsoft Excel spreadsheets that illustrate how I calculated the investment incomes lost by the thirteen employees and the employees' tax liabilities in 2007. Because the S&P 500 does not assume brokerage fees and expenses are charged, but also does not assume payment and reinvestment of dividends, the actual losses that I calculated for the employees are still arguably *undervalued*. *See FactSet Dividend Quarterly: S&P 500*, FactSet Research Systems Inc., http://www.factset.com/websitefiles/PDFs/dividend/dividend_12.18.14 (last visited Dec. 22, 2014) ("The dividend yield on a trailing 12-month basis was 1.9% at the end of the third quarter (October), which was equal to the 10-year median [(2004 to 2014)].").

assets are jointly controlled"; "projected earnings and other income of the defendant"; and "any financial obligations of the defendant, including obligations to dependents." 18 U.S.C. § 3664(f)(2) (noting that a court's restitution order may direct the defendant to make a lump-sum payment or periodic payments). The facts below are drawn largely from the parties' briefs regarding Bartleson's ability to pay a fine.

First, as to Bartleson's assets, I find that Bartleson has the financial resources from which to pay restitution. According to Bartleson's PSIR, his total net worth is $98,500.00. PSIR ¶ 44. The report provides that he has $206,00.00 in assets and $107,500.00 in liabilities.[77] Id. Bartleson is able to generate a total monthly income of $5,150.00 (i.e., net income of $1,500.00, plus spouse income of $3,650.00). Bartleson's total monthly expenses allegedly equate to $5,181.00. Id. Despite the loans Bartleson owes to his father and brother, who assisted Bartleson in paying restitution, and the alleged "substantial tax debts," Bartleson's probation officer and the prosecution concluded that "it appears the defendant has the ability to pay a financial penalty." PSIR ¶ 47. I am persuaded by the probation officer's calculations and assessment of Bartleson's net worth that he still has financial resources to pay additional restitution.[78]

---

[77] The liabilities consist of Bartleson's mortgage ($77,500.00), a personal loan to his father ($20,000.00), and a personal loan to his uncle ($10,000.00). The mortgage and loans were never verified by any documentation submitted to me before or at sentencing.

[78] In making this finding, I overrule Bartleson's objections to paragraphs 44 and 47 of the PSIR. See PSIR ¶ 44, ¶ 47. Although Bartleson objects to paragraph 44 for not including Bartleson's alleged substantial tax debts and the PSIR's failure to include Bartleson's monthly payments on his tax debts and loans, the information in paragraph 44 is derived from a personal financial statement completed by Bartleson. On that financial form, Bartleson does not list any current tax debt or monthly payments for his tax debt. Nor does Bartleson report any monthly payments for his loans, which allegedly total $30,000; he received the loans from his father and brother. While paragraph 9 of

Second, as to Bartleson's future projected cash flow, Bartleson's monthly income consists of $5,150.00. Bartleson will be serving a term of probation. This will enable him to continue to earn money in order to pay his restitution order.

Third, as to Bartleson's financial obligations, the present financial obligations that Bartleson confronts do not concern a dependent. *Cf. Weimer*, 2014 WL 6680892 at *15 ("[T]he present financial obligations that Weimer confronts concern a dependent. Weimer takes care of her 38 year old son, Danny Koenig, who has cerebral palsy."). I am also unaware of any other obligations, such as a civil suit or administrative action, that would stand in the way of restitution by giving the employees of Bartleson Masonry double recovery or a windfall. *See United States v. Louper-Morris*, 672 F.3d 539, 566 (8th Cir. 2012) ("[T]he MVRA does not allow victims to obtain double recovery or a windfall through restitution." (citing *United States v. Frazier*, 651 F.3d 899, 910–11 (8th Cir. 2011); *Ruff*, 420 F.3d at 775))).

In sum, I ordered payment of restitution in the additional amount of $20,838.99—that is, in addition to the $41,878.22 that Bartleson already paid to the government.

---

the PSIR provides that Bartleson and his brother owed over $70,000 in state tax debts at the time of the DOL's investigation (*i.e.*, $70,424), no additional information has been provided to me to prove the Bartlesons still owe state taxes. *See* PSIR ¶ 9. However, according to his brief, that objects to the DOL Report, Bartleson asserts that it is his "understanding that [Bartleson Masonry's] payroll taxes have been repaid today." Defendant's Supplemental Objections To Revised Presentence Investigation Report at 2. Also, Bartleson alleges that, at the time of the DOL Report, he and his brother "did not owe any payroll taxes in their individual capacities." *Id.* at 2. Finally, Bartleson takes issue with the fact that the PSIR does not include certain monthly payments, such as Internet and veterinarian costs. However, as noted by the probation officer, such expenses "are not usually considered necessary monthly expenses and therefore, not included in this section of the [PSIR]." PSIR ¶ 44. Without any additional evidence or supporting documentation regarding Bartleson's debts and loans, I cannot sustain Bartleson's objections to paragraphs 44 and 47 of the PSIR.

Based on my analysis above, Bartleson's restitution amount shall be paid in one lump sum. *See* 18 U.S.C. § 3664(f)(3)(A) (authorizing, *inter alia*, lump-sum payment of restitution). My decision to schedule payment in this manner is based on Bartleson's cash on hand, the value of his properties, and his net income.

## IV.    CONCLUSION

Bartleson's embezzlement scheme occurred over a three-year period. His abuse of trust grew out of his position as co-owner, Vice President, Secretary, and Treasurer. He was able to facilitate and conceal his criminal conduct by way of his various positions. "[T]he 'primary concern' of the [abuse-of-trust] enhancement is to deter and punish defendants who use the discretion and autonomy provided to them by virtue of their positions to commit or conceal wrongs that are difficult to detect." *United States v. Ghertler*, 605 F.3d 1256, 1266 (11th Cir. 2010) (quoting *Garrison*, 133 F.3d at 838). "The concern behind the 'abuse of a position of trust' enhancement focuses on the relationship between the defendant and his victims." *United States v. Reetz*, 18 F.3d 595, 600 (8th Cir. 1994).

In his position of trust, in which he operated with little to no oversight, Bartleson abused discretionary authority entrusted to him by his employees. He took advantage of what Annette Baier referred to as the employees' "accepted vulnerability," which makes him "'more culpable.'" *See Trust* at 235; *see also Ghertler*, 605 F.3d at 1266. Thus, in my judgment, Bartleson deserves some penalty for his actions. *See Ghertler*, 605 F.3d at 1266 (opining that "persons who abuse authority entrusted to them by others are simply

'more culpable,' and thus deserving of harsher penalties.");[79] *see also* U.S.S.G. § 3B1.3 cmt. background (noting "persons who abuse their positions of trust . . . to facilitate significantly the commission or concealment of a crime" are generally "viewed as more culpable.").

In sum, at Bartleson's sentencing, I found that the two-level upward adjustment for abuse of a position of trust was warranted.  I applied the enhancement based on my findings that (1) Bartleson was in a position of private trust; (2) he abused his employees' trust for the specific purpose of facilitating the commission and concealment of his embezzlement; and (3) an abuse of trust is not included in Bartleson's base offense level or a specific offense characteristic.  *Waldner*, 564 F.Supp.2d at 936.  In addition, as explained above, I also find that Note 5 of the Commentary under Sentencing Guideline U.S.S.G. § 3B1.3 applies because the plan qualifies as an "employee pension benefit plan," and Bartleson served as a "fiduciary" under Note 5 vis-à-vis the Plan.

After all applicable adjustments and departures, and after considering the factors under 18 U.S.C. § 3553(a), I found that a sentence of probation for two years is

---

[79] I cite to *Ghertler* for its articulation of the "primary concerns" underlying the abuse-of-trust enhancement.  However, it is worth noting that the facts of this case are distinct from *Ghertler*.  In *Ghertler*, the Eleventh Circuit Court of Appeals found that the district court erred by applying the abuse-of-trust enhancement where the defendant did not "maintain a lengthy relationship of trust with his victims."  *Ghertler*, 605 F.3d at 1266.  Nor did the defendant "perpetrate difficult-to-detect frauds over time because he operated with little or no oversight from superiors."  *Id*.  Unlike the offenses that were committed by Bartleson, the defendant's offenses in *Ghertler* "raised suspicions almost immediately because his frauds were overt and not in keeping with standard company practices."  *Id*. at 1267.  In addition, the defendant in *Ghertler* "did not abuse the trust that others had placed in him to act on their behalf."  *Id*.  While the two-level enhancement under § 3B1.3 did not apply in *Ghertler*, the enhancement applies here because Bartleson both entered into and abused relationships of trust with the employees of his company.  *See id*.

appropriate for all of the reasons explained in open court during the sentencing. Bartleson's allocution demonstrated genuine and sincere remorse. He truly took full responsibility for his misdeeds and displayed unsurpassed candor in explaining his conduct. I also ordered Bartleson to pay additional restitution in the amount of $20,838.99 to the former employees of Bartleson Masonry pursuant to the MVRA, 18 U.S.C. § 3663A. At Bartleson's sentencing, I requested that the prosecution advise the victims of the effect of 18 U.S.C. § 3664(m)(1)(B). Pursuant to that statutory provision, "at the request of the victim, the clerk of court must issue an 'abstract of judgment' as a lien on [Bartleson's] property."[80] *Weimer*, 2014 WL 6680892, *16 n.21 (quoting 18 U.S.C. § 3664(m)(1)(B)). Postjudgment interest will accrue on Bartleson's restitution from the date that this order is filed until Bartleson pays restitution in full.[81]

    **IT IS SO ORDERED.**

    **DATED** this 10th day of February, 2015.

_Mark W. Bennett_
_____
**MARK W. BENNETT**
**U.S. DISTRICT COURT JUDGE**
**NORTHERN DISTRICT OF IOWA**

---

[80] "An order of restitution pursuant to the MVRA 'is a lien in favor of the United States' on [Bartleson's] property and [his] rights to property, including [his] residence, which 'arises on the entry of the judgment[.]'" *Weimer*, 2014 WL 6680892, *16 n.21 (quoting 18 U.S.C. § 3613(c)).

[81] *See Weimer*, 2014 WL 6680892, *14 (finding that "[p]ostjudgment interest will [ ] begin accruing on the date of the entry of this order until [the defendant] pays restitution in full, and postjudgment interest shall be determined by using the Treasury Bill rate prevailing on the date pursuant to 28 U.S.C. § 1961.").

**Employee 1 — Thompson**

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $2,057.29 | $881.71 | $2,939.00 | 1,270.20 | 2,011.27 | 58.34% | $1,714.61 | $2,939.00 | – | $4,653.61 |
| 07/01/2007 | 01/14/2015 | $1,933.23 | $828.53 | $2,761.76 | 1,503.35 | 2,011.27 | 33.79% | $933.20 | $2,761.76 | $193.32 | $3,888.28 |
| 07/01/2008 | 01/14/2015 | $356.72 | $152.88 | $509.60 | 1,280.00 | 2,011.27 | 57.13% | $291.13 | $509.60 | – | $800.73 |
| Total | | $4,347.24 | $1,863.12 | $6,210.36 | | | | $2,938.94 | $6,210.36 | $193.32 | $9,342.62 |

**Employee 2 — Wagner**

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $1,307.93 | $784.76 | $2,092.69 | 1,270.20 | 2,011.27 | 58.34% | $1,220.88 | $2,092.69 | – | $3,313.57 |
| 07/01/2007 | 01/14/2015 | $1,280.28 | $790.97 | $2,071.25 | 1,503.35 | 2,011.27 | 33.79% | $699.80 | $2,071.25 | $128.03 | $2,899.16 |
| 07/01/2008 | 01/14/2015 | $310.50 | $186.30 | $496.80 | 1,280.00 | 2,011.27 | 57.13% | $283.82 | $496.80 | – | $780.62 |
| Total | | $2,898.71 | $1,762.03 | $4,660.74 | | | | $2,204.58 | $4,660.74 | $128.03 | $6,993.35 |

**Employee 3 — Rauk**

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $715.45 | $715.45 | $1,430.90 | 1,270.20 | 2,011.27 | 58.34% | $834.79 | $1,430.90 | – | $2,265.69 |
| 07/01/2007 | 01/14/2015 | $751.53 | $751.53 | $1,503.06 | 1,503.35 | 2,011.27 | 33.79% | $507.88 | $1,503.06 | $75.15 | $2,086.09 |
| 07/01/2008 | 01/14/2015 | $258.49 | $258.49 | $516.98 | 1,280.00 | 2,011.27 | 57.13% | $295.35 | $516.98 | – | $812.33 |
| Total | | $1,725.47 | $1,725.47 | $3,450.94 | | | | $1,638.02 | $3,450.94 | $75.15 | $5,164.11 |

**Employee 4 — Slater**

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $2,165.80 | $812.18 | $2,977.98 | 1,270.20 | 2,011.27 | 58.34% | $1,737.35 | $2,977.98 | – | $4,715.33 |
| 07/01/2007 | 01/14/2015 | $2,129.92 | $798.76 | $2,928.68 | 1,503.35 | 2,011.27 | 33.79% | $989.60 | $2,928.68 | $212.99 | $4,131.27 |
| 07/01/2008 | 01/14/2015 | $478.58 | $179.47 | $658.05 | 1,280.00 | 2,011.27 | 57.13% | $375.94 | $658.05 | – | $1,033.99 |
| Total | | $4,774.30 | $1,790.41 | $6,564.71 | | | | $3,102.89 | $6,564.71 | $212.99 | $9,880.59 |

**Employee 5 — Norton**

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $913.95 | $456.99 | $1,370.94 | 1,270.20 | 2,011.27 | 58.34% | $799.81 | $1,370.94 | – | $2,170.75 |
| 07/01/2007 | 01/14/2015 | $1,235.63 | $617.83 | $1,853.46 | 1,503.35 | 2,011.27 | 33.79% | $626.28 | $1,853.46 | $123.56 | $2,603.30 |
| 07/01/2008 | 01/14/2015 | $288.12 | $144.07 | $432.19 | 1,280.00 | 2,011.27 | 57.13% | $246.91 | $432.19 | – | $679.10 |
| Total | | $2,437.70 | $1,218.89 | $3,656.59 | | | | $1,673.00 | $3,656.59 | $123.56 | $5,453.15 |

**Employee 6 — Isern**

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | – | – | – | 1,270.20 | 2,011.27 | 58.34% | – | – | – | – |
| 07/01/2007 | 01/14/2015 | $317.46 | $238.13 | $555.59 | 1,503.35 | 2,011.27 | 33.79% | $187.73 | $555.59 | $31.75 | $775.07 |
| 07/01/2008 | 01/14/2015 | – | – | – | 1,280.00 | 2,011.27 | 57.13% | – | – | – | – |
| Total | | $317.46 | $238.13 | $555.59 | | | | $187.73 | $555.59 | $31.75 | $775.07 |

## Employee 7 — Berding

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $825.07 | $618.80 | $1,443.87 | 1,270.20 | 2,011.27 | 58.34% | $842.35 | $1,443.87 | – | $2,286.22 |
| 07/01/2007 | 01/14/2015 | $888.33 | $666.32 | $1,554.65 | 1,503.35 | 2,011.27 | 33.79% | $525.32 | $1,554.65 | $88.83 | $2,168.80 |
| 07/01/2008 | 01/14/2015 | $178.20 | $133.67 | $311.87 | 1,280.00 | 2,011.27 | 57.13% | $178.17 | $311.87 | – | $490.04 |
| Total | | $1,891.60 | $1,418.79 | $3,310.39 | | | | $1,545.84 | $3,310.39 | $88.83 | $4,945.06 |

## Employee 8 — Perry

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $401.88 | $401.88 | $803.76 | 1,270.20 | 2,011.27 | 58.34% | $468.91 | $803.76 | – | $1,272.67 |
| 07/01/2007 | 01/14/2015 | $479.07 | $479.07 | $958.14 | 1,503.35 | 2,011.27 | 33.79% | $323.76 | $958.14 | $47.91 | $1,329.81 |
| 07/01/2008 | 01/14/2015 | $95.26 | $95.26 | $190.52 | 1,280.00 | 2,011.27 | 57.13% | $108.84 | $190.52 | – | $299.36 |
| Total | | $976.21 | $976.21 | $1,952.42 | | | | $901.51 | $1,952.42 | $47.91 | $2,901.84 |

## Employee 9 — Kruse

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $697.16 | $522.90 | $1,220.06 | 1,270.20 | 2,011.27 | 58.34% | $711.78 | $1,220.06 | – | $1,931.84 |
| 07/01/2007 | 01/14/2015 | $743.28 | $557.52 | $1,300.80 | 1,503.35 | 2,011.27 | 33.79% | $439.54 | $1,300.80 | $74.33 | $1,814.67 |
| 07/01/2008 | 01/14/2015 | $146.34 | $109.79 | $256.13 | 1,280.00 | 2,011.27 | 57.13% | $146.33 | $256.13 | – | $402.46 |
| Total | | $1,586.78 | $1,190.21 | $2,776.99 | | | | $1,297.65 | $2,776.99 | $74.33 | $4,148.97 |

## Employee 10 — Peterson

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $1,059.21 | $529.61 | $1,588.82 | 1,270.20 | 2,011.27 | 58.34% | $926.92 | $1,588.82 | – | $2,515.74 |
| 07/01/2007 | 01/14/2015 | $1,260.23 | $630.18 | $1,890.41 | 1,503.35 | 2,011.27 | 33.79% | $638.77 | $1,890.41 | $126.02 | $2,655.20 |
| 07/01/2008 | 01/14/2015 | $298.73 | $149.39 | $448.12 | 1,280.00 | 2,011.27 | 57.13% | $256.01 | $448.12 | – | $704.13 |
| Total | | $2,618.17 | $1,309.18 | $3,927.35 | | | | $1,821.70 | $3,927.35 | $126.02 | $5,875.07 |

## Employee 11 — Buck

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $465.62 | $465.62 | $931.24 | 1,270.20 | 2,011.27 | 58.34% | $543.29 | $931.24 | – | $1,474.53 |
| 07/01/2007 | 01/14/2015 | $544.34 | $544.34 | $1,088.68 | 1,503.35 | 2,011.27 | 33.79% | $367.86 | $1,088.68 | $54.43 | $1,510.97 |
| 07/01/2008 | 01/14/2015 | $114.99 | $114.99 | $229.98 | 1,280.00 | 2,011.27 | 57.13% | $131.39 | $229.98 | – | $361.37 |
| Total | | $1,124.95 | $1,124.95 | $2,249.90 | | | | $1,042.54 | $2,249.90 | $54.43 | $3,346.87 |

## Employee 12 — Tamayo

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $362.42 | $362.42 | $724.84 | 1,270.20 | 2,011.27 | 58.34% | $422.87 | $724.84 | – | $1,147.71 |
| 07/01/2007 | 01/14/2015 | $420.98 | $420.98 | $841.96 | 1,503.35 | 2,011.27 | 33.79% | $284.50 | $841.96 | $42.10 | $1,168.56 |
| 07/01/2008 | 01/14/2015 | $80.42 | $80.42 | $160.84 | 1,280.00 | 2,011.27 | 57.13% | $91.89 | $160.84 | – | $252.73 |
| Total | | $863.82 | $863.82 | $1,727.64 | | | | $799.26 | $1,727.64 | $42.10 | $2,569.00 |

## Employee 13 — Willert

| Beg Date | End Date | Employee Cont. | Employer Match | Total | S&P Beg. Value | S&P End. Value | S&P 500 Return | Return | Original Inv. | Taxes (10%) | Total Owed |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 07/01/2006 | 01/14/2015 | $417.30 | $417.30 | $834.60 | 1,270.20 | 2,011.27 | 58.34% | $486.91 | $834.60 | – | $1,321.51 |
| 07/01/2007 | 01/14/2015 | – | – | – | 1,503.35 | 2,011.27 | 33.79% | – | – | – | – |
| 07/01/2008 | 01/14/2015 | – | – | – | 1,280.00 | 2,011.27 | 57.13% | – | – | – | – |
| Total | | $417.30 | $417.30 | $834.60 | | | | $486.91 | $834.60 | – | $1,321.51 |

| | | | | | | | Totals: | $19,640.57 | $41,878.22 | $1,198.42 | $62,717.21 |